[Civ. No. 14827. First Dist., Div. One. May 7, 1952.]

IOLA GALLI, Plaintiff and Appellant, v. EDMUND G. BROWN, Individually and as District Attorney, etc., Defendant and Appellant; HARRY D. ROSS, Individually and as City and County Controller, etc., et al., Respondents.

Delany, Jarvis, Fishgold & Werchick and Martin J. Jarvis for Plaintiff and Appellant.

Norman Elkington, Thomas B. Larkin and Hancock, Elkington, Rothert & Low for Defendant and Appellant.

Dion R. Holm, City Attorney, and William F. Bourne, Deputy City Attorney, for Respondents.

PETERS, P. J.—After demand on, and refusal by, the proper authorities to sue, Iola Galli, as a taxpayer,[1] commenced these actions against the district attorney, the controller and treasurer of the city and county of San Francisco, to recover on behalf of the city the amount of salaries paid to two city and county employees, it being contended that the two employees were hired contrary to the provisions of the city and county charter.[2]

The controversy involves the appointment by Edmund Brown, then the district attorney of the city and county of San Francisco, of Roger Garety and William Mullins, it being contended by Galli that both were employed as assistant attorneys in the district attorney's office illegally in that neither possessed the necessary qualification of two years' admission to practice law, as required by section 34 of the charter.[3] As to Garety, it was also contended that, when appointed, he had not been a resident of San Francisco for at least one year immediately prior to his appointment as required by section 7 of the charter.[4]

---

[1] Section 27 of the charter provides that in the event a taxpayer institutes such an action "if judgment be finally entered in his favor he shall be allowed his costs and also such reasonable compensation for attorney's fees as may be fixed by the court."

[2] Section 86 of the charter provides, in part: "Every officer who shall approve, allow or pay any demand on the treasury not authorized by law, ordinance or this charter, shall be liable to the city and county individually and on his official bond for the amount of the demand so illegally approved, allowed or paid."

[3] Section 34 provides, in part: "The elective officers of the city and county may appoint such assistants and employees as are authorized by the supervisors upon the recommendation of the mayor, in the annual budget and annual or supplemental appropriation ordinances, . . . Each assistant attorney in the offices of . . . the district attorney . . . must, at the time of his appointment, be qualified to practice in all the courts of the state and must have been so qualified for at least two years next preceding his appointment. The salaries . . . for assistants and employees in such elective offices, shall be fixed as provided by the salary standardization provisions of this charter."

[4] Section 7 provides, in part: "All employees of the city and county shall be citizens and shall have been residents thereof, for at least

The public officials involved defended on several grounds, one of the main defenses being that the two employees were not employed as assistant attorneys, but were lawfully employed as warrant and bond clerks pursuant to section 30[5] of the charter, it being contended that such employees do not have to be admitted to practice law for two years prior to their appointment.

It is an admitted fact that neither Garety nor Mullins had been admitted to practice for two years prior to March 1, 1949 (the date of their appointments), each having been admitted to practice just a few months prior to his employment.

The trial court found that the employments were illegal, and entered its judgments against Brown and in favor of the city in the total sum of $6,460, the amounts admittedly received by Garety and Mullins as salary, and also awarded Galli, as against Brown, $2,500 attorney fees. So far as the controller and treasurer are concerned, the court found that they had allowed and paid the salary claims of Garety and Mullins in accordance with the charter provisions, and were not legally responsible for the illegal payments. Judgments were entered in their favor. Brown appeals from the judgments against him and from the orders denying his motions for a new trial. The last mentioned orders are nonappealable, and the appeals therefrom should be dismissed. Galli appeals from the judgments in favor of the controller and treasurer.

## The Facts

Early in 1949, Garety and Mullins, recently admitted to the bar, applied for positions in the district attorney's office.

one year prior to the appointment, . . . A 'resident' within the intent and purpose of this section, means one who actually lives within the city and county and maintains an abode therein, where such resident with his family, if any, customarily spends the night . . ."

[5]Section 30 provides: "There shall be a warrant and bond office. The district attorney shall appoint an assistant to have charge of the warrant and bond office to be designated warrant and bond deputy, and such additional assistants and clerks as may be provided by the budget and appropriation ordinances. No person shall be appointed warrant and bond deputy who is not at the time of his appointment qualified to practice law in all the courts of this state." Then follows an enumeration of the duties of the deputy in the warrant and bond office. Reference will hereafter be made to these duties. The section concludes: "In the matter of fixing bail and ordering the release of prisoners the warrant and bond deputy shall be subject to the judges of the municipal court and the judges of any court in the city and county empowered by law to act as magistrates."

They were both told by Brown that, because of their lack of two years' experience, they could not be appointed assistant attorneys, but it was suggested that they might be appointed warrant and bond clerks. Each agreed to take such a position. Brown telephoned to Henderson, personnel director of the city and county and secretary of the civil service commission, told him that the two applicants had not been admitted for two years, and asked him if he, Brown, could appoint them bond and warrant clerks under the classification of "K52 Junior Attorney, Criminal." Henderson replied that the two applicants could be so appointed. Brown thereupon submitted to the civil service commission, on proper forms, proposed appointments of the two applicants, giving the class number and title of the positions as "K52 Junior Attorney, Criminal (Bond and Warrant Clerk.)" The words in parentheses are not found in the salary standardization ordinance or in the civil service classification, but were added by Brown to indicate that the two proposed employees were being hired as clerks in the warrant and bond office and not as assistant attorneys in the district attorney's office. Henderson, for the civil service commission, Ross, as controller, and the mayor's office approved the applications. The two appointees started to work on March 1, 1949. These actions were filed in November of 1949.

Between March and November the two employees worked in the warrant and bond office. Both accepted bail pursuant to a schedule prepared by the judges; they released prisoners who produced bail; they heard complaints and determined whether citations should issue; they conducted citation hearings and warrant hearings, consulting superiors in all but the clearest cases; and they processed complaints and warrants. Both occasionally advised city, county and state officials as to the proper charges to be filed. On a few occasions, 15 as to Garety, 18 as to Mullins, on the instructions of the deputy in charge of the warrant and bond office, each appeared at afternoon sessions of the traffic court as the representative of the district attorney's office, calling the calendar, occasionally questioning witnesses and informing defendants of their legal rights. Twice Garety appeared in the superior court to sit, observe, and assist the regular deputy district attorney assigned to that court. Apparently, the traffic court appearances were caused by shortage of personnel in the district attorney's office during vacation periods.

In addition to signing the appointment applications, Brown,

as appointing officer, certified that the persons to be appointed were citizens and residents as required by section 7 of the charter. It is admitted that Mullins possessed these qualifications, but it is contended, and the trial court found, that Garety did not possess the residence requirement in that he had not been a resident of San Francisco for one year immediately prior to his appointment.

The facts in reference to Garety's residence are not in serious dispute. He was born in San Francisco and resided here, except for a few months, until he entered the army during the last war. His father was a city employee, and had so worked for many years. Garety was discharged from the army in 1946. He was then married and had one child. He was unable to find, within his means, a place to rent in San Francisco. His parents, who live in San Francisco, purchased a crib for the baby and a bed for Garety and his wife, and the young Garetys moved in with the elder Garetys. The parents of the wife of young Garety live in Oakland, and they too offered the young couple and their child emergency accommodations. Young Garety was attending a night law school in San Francisco, and got a day job in Oakland as a playground director.

Garety testified that during the one-year period prior to March 1, 1949, he and his family used both the San Francisco home of his parents and the Oakland home of his wife's parents as their residence, and that they spent about half of their time in each place. Weekends, starting Friday nights, holidays, and a few week nights were spent in San Francisco, while the balance of the time was spent in Oakland.

Garety secured a job as a playground director in Oakland, and registered to vote and did vote in Alameda County. In January of 1949, after passing the bar examination, he found a place to live in San Francisco, rented it, moved here with his family, changed his voting registration to San Francisco, and has lived here ever since. When he was interviewed by Brown in February, 1949, he was in fact and in law a resident of San Francisco. Brown asked Garety where he lived, and was told San Francisco. Brown also made inquiry of the two persons who had recommended Garety for the appointment and was told that Garety had lived in San Francisco all of his life, and that Garety's father was an employee of the city.

### *Pertinent Charter Provisions, Ordinances, etc.*

In addition to the portions of the charter already set forth, there are other provisions that should be mentioned. Section 25 through section 34 deals with the "Powers and Duties of Elective Officers." Each office is treated separately. Section 25 deals with the mayor; section 26 with the city attorney; section 27, already quoted, with taxpayer's suits; section 28 with the assessor; section 29 with the district attorney; section 30, quoted above, with the warrant and bond office; section 31 with the treasurer; section 32 with the sheriff; section 33 with the public defender; and section 34, above quoted, with assistants and employees in elective offices.

There is no doubt that the charter makes a distinction between the district attorney's office as such, and the warrant and bond office. Section 29 fixes the salary and qualifications of the district attorney and then provides "He shall appoint, and at his pleasure may remove, all assistants and employees in his office." That means assistants and employees in the district attorney's office appointed under section 29. Section 29 also provides: "The district attorney, either in person or by his assistants, shall prosecute all criminal cases in the municipal and superior courts, draw all complaints, and issue warrants for the arrest of persons charged with crime who are to be prosecuted in such courts."

Section 30, a portion of which has already been quoted, refers to the warrant and bond office. After providing that there shall be such an office presided over by a deputy appointed by the district attorney, and that such deputy must be admitted to practice law (but for no time period) the section continues:

"The warrant and bond deputy shall keep his office open continuously night and day for the transaction of business; he shall draw and approve with his signature all complaints and warrants in criminal actions to be prosecuted in the municipal courts and any inferior court established by law in this city and county and possessing criminal jurisdiction; he shall have custody of all bail bonds and appeal bonds taken in such courts.

"The warrant and bond deputy may issue bail bonds and appeal bonds and order the discharge from custody of the persons for whom such bonds are approved by a magistrate. He may fix cash bail in misdemeanor cases where arrests are made without warrants and may take cash bail in all cases arising in the municipal court . . . and may order the dis-

charge from custody of the persons for whom cash bail is deposited with him.''

The section then provides that in fixing bail and releasing prisoners the deputy is subject to the control of the judges.

Reference should also be made to section 141. It confers certain powers on the civil service commission as to noncivil service employees subject to salary standardization. It reads, in part, as follows:

''The civil service commission shall be the employment and personnel department of the city and county and shall determine appointments on the basis of merit and fitness, as shown by appropriate tests. . . . The commission shall likewise classify all other positions or other places of employments in the city and county service specifically exempted from the civil service provisions of this charter, but which, by the provisions of section 151, thereof, are made subject to classification for salary standardization purposes on the basis of duties and responsibilities of the employment, and training and experience required. The civil service commission shall be the judge of such classification.

''The commission shall also, in accordance with duties and responsibilities, allocate, and from time to time may reallocate, the positions to the various classes of the classification. The allocation or reallocation of a position shall not adversely affect the civil service rights of an occupant regularly holding such position. No person shall hold a position outside of the classification to which he has been appointed, provided that every employee of any department or office shall discharge any of the duties pertaining to such department or office to which his chief may temporarily assign him.

''The class titles and class numbers assigned to positions by the commission shall be used in all records, reports, statements and communications, including the compensation schedule, annual budget and salary ordinance, payrolls, and appropriation ordinances.

''The commission shall adopt rules to carry out the civil service provisions of this charter . . .''

Section 151 requires the board of supervisors, by ordinance, to fix salaries for all officers and employees of the city, after first receiving from the civil service commission a schedule of compensations for all positions covered by the section.

The salary standardization ordinance and the classification of duties of positions prepared by the civil service commission has no specific reference to a warrant and bond clerk.

Prior to 1942 there was a classification of "B154 Criminal Law Clerk" which, among other things, included the duties of a clerk in the warrant and bond office. In 1942 the then district attorney requested the civil service commission to reallocate the position so as to describe more accurately the duties. The commission's minutes for May 20, 1942, indicate that the request was made because the duties of the bond and warrant clerks required legal background, and were not clerical in nature. Under these circumstances, the commission amended the classification of "B154 Criminal Law Clerk" by deleting therefrom the reference to the district attorney's office. At the same time, it also created a new classification of "K52 Junior Attorney, Criminal," and fixed the duties of that office. This classification was amended in 1943 to become effective July 1, 1944, and was in effect in March of 1949 when Garety and Mullins were appointed, and at the time of trial in February, 1950. This classification and duty statement reads as follows: "K52 Junior Attorney, Criminal—Under general supervision: hears and determines complaints in the warrant and bond office of the district attorney's office; issues citations; prepares complaints and warrants for issuance by magistrates; advises police officers, municipal and state inspectors and investigators as to proper criminal charges; subject to judicial approval, fixes bail in misdemeanor cases where arrest is without warrant; accepts bail and issues receipt therefor; acts as relief attorney in prosecuting matters before the municipal court; and performs related duties as required."

The deputy in charge of the warrant and bond office is classified as "K58 Principal Attorney, Criminal."

*Were Garety and Mullins Appointed as Warrant and Bond Clerks or as Assistant Attorneys?*

This is the pivotal question in the case. The trial court has found that they were appointed as assistant attorneys within the meaning of section 34 of the charter, and that their appointments were illegal inasmuch as they had not been admitted to practice for two years. We are of the opinion that the trial court decided this question of law incorrectly. It is our view that both men were lawfully employed as warrant and bond clerks under section 30 of the charter.

As already pointed out, the warrant and bond office, under section 30, is separate and distinct from the district attorney's office, and is so treated in the charter. Section 30 creates

the office, and then provides that a deputy appointed by the district attorney shall have "charge" of the office. The duties of the office are set forth, and it is then provided that the deputy shall keep "his" office open day and night, and it further provided what he shall do in the operation of the office—not what shall be done in the name of the district attorney. The section closes with the provision that as to certain of his functions the deputy shall be subject to the control of the judges. The section clearly provides that the deputy in charge acts for himself as such deputy as to most of his duties, not as the representative of the district attorney. This is of some significance. (See discussion 21 Cal. Jur. p. 1007, § 168.)

Brown was required to appoint the deputy in charge of the warrant and bond office, and also "such additional assistants and clerks as may be provided by the budget and appropriation ordinances." So far as the deputy in charge is concerned, section 30 of the charter requires that he be admitted to the bar, but not that he have two years' experience. The provision of section 34 requiring assistant attorneys in the district attorney's office to have two years' experience has no application to the deputy in charge of the warrant and bond office. It is equally clear that, so far as any charter requirement is concerned, "assistants and clerks" do not have to be attorneys at all, and certainly do not have to have two years' experience. Section 34 has no application to such assistants and clerks. If it did, then the logically ridiculous situation would be presented where the assistants and clerks have to have higher qualifications than the deputy in charge. This difference in treatment by the charter between assistant attorneys in the district attorney's office and clerks in the bond and warrant office is based on important differences of function. Assistants in the district attorney's office are primarily trial attorneys and need experience if the People are to be properly represented. But the assistants and clerks in the warrant and bond office perform primarily clerical and administrative work.

Brown was required to appoint necessary assistants and clerks in the warrant and bond office. In making such appointments he was required, by the charter, to respect and to follow the civil service commission's classifications. The only classification that embraces the duties of the warrant and bond clerk is "K52 Junior Attorney, Criminal." This title indicates that the appointee is an attorney—but, as al-

ready pointed out, that is not a requirement of the charter. Under the old classification of "B154 Criminal Law Clerk" under which clerks were formerly appointed in the warrant and bond office, it is perfectly clear that such clerks did not have to be attorneys. But the minutes of the civil service commission disclose that in 1942 the then district attorney had decided to appoint only attorneys to these jobs because the clerks were required to perform legal duties. Thus, when the commission, at the then district attorney's request, changed the classification to "K52 Junior Attorney, Criminal" it obviously intended to thus designate the position of clerk in the bond and warrant office, and by the title gave practical recognition to the fact that the appointing power—the district attorney—had determined that such clerks should be lawyers. But this was merely a determination by the district attorney without charter compulsion. The charter does not require that such clerks be lawyers at all. By deciding to appoint a lawyer to such a position certainly the district attorney was not attempting to change the position from that of clerk in the warrant and bond office to assistant attorney in his office. The district attorney not only does not possess the power to thus change the charter, but Brown definitely stated in making the appointment that he had no such intent. He ascertained from Henderson that the K52 classification was intended by the commission to describe the duties of the clerks in the warrant and bond office. Then, in making the appointments, he described the jobs as "K52 Junior Attorney, Criminal (Bond and Warrant Clerk.)"

The respondent argues that after the appointments were made Garety and Mullins performed some legal duties, and even appeared occasionally in traffic court as representatives of the district attorney. There is no doubt that on occasion these two men performed some of the functions normally performed by an assistant attorney in the district attorney's office, but these were not regular assignments but were done in emergencies and to gain experience. Such temporary assignments were probably valid under section 141 of the charter permitting temporary assignments. But whether these temporary assignments were valid or not need not be here decided. Obviously, the validity of the appointments must be determined as of the date they were made, regardless of what the appointees may have done later. These appointments being valid when made would not be adversely affected by the fact that the appointees performed some duties

that they were not qualified to perform. In our opinion, the two years' service requirement was not applicable to either Mullins or Garety.

*Residence of Garety and Its Effect on the Liability of Brown*

The determination that these two men were appointed legally as warrant and bond clerks disposes of the case so far as Mullins is concerned, but it does not dispose of the case involving Garety. As to him, the trial court found that his appointment was illegal for the additional reason that he did not possess the residence requirements demanded by section 7 of the charter. In our opinion, that finding is supported by the evidence.

Section 7 requires that all city employees shall have been city residents "for at least one year prior to the appointment," and then defines what is meant by residence. Brown does not argue that the evidence shows residence for the one year immediately prior to the appointment, but argues that the charter simply requires residence for any one year at any time prior to the appointment. In this connection Brown refers to other portions of section 7 that contain more precise language. Thus, it is required that candidates for elective office must have been electors of the city "for at least one year immediately prior to the time of his taking office." The section also requires that members of the police and fire departments must have been residents "for at least five years next preceding appointment." It is argued that by being so precise as to these city officers and employees, the framers of the charter intended a different rule to apply when they simply used the word "prior," and intended it to mean any time prior.

The argument is unsound. ▆▆▆ The plain meaning of the portions of section 7 here involved is that the one year's residence must immediately precede the appointment. Garety did not possess this qualification, so that he was not qualified for the position when appointed. His appointment was therefore illegal.

This determination, however, is not decisive of the case as against Brown. This is not a suit against the unlawfully employed Garety to compel him to repay the sums illegally paid to him, but against Brown as the appointing power. There is no pleading or finding that Brown, in appointing Garety, acted in bad faith, or even negligently. There is no evidence that would have supported such findings had

they been made. The record shows that Brown did not know of Garety's residence in Oakland. He was told by Garety that he was a resident of San Francisco, which was then the fact. Inquiry developed the fact that Garety had been born in San Francisco, and that his father was a city employee residing in San Francisco. It was natural to assume that the residence of Garety in the city had not been broken. The only finding that could have been made on this issue would have been that Brown made the appointment in the good faith belief that Garety possessed the requisite residence requirements. No serious contention is made to the contrary.

Is the district attorney who illegally but in good faith hires a warrant and bond clerk personally liable for all salary paid such clerk? ▮ At common law there would be no liability. It is well established at common law that where a public officer is empowered to and does exercise judgment, but acts mistakenly or erroneously, he is not liable when he acts in good faith within the general scope of his authority, without malice, corruption or sinister motives. (*Holman* v. *County of Santa Cruz,* 91 Cal.App.2d 502 [205 P.2d 767]; *People* v. *Standard Accident Ins. Co.,* 42 Cal.App.2d 409 [108 P.2d 923]; *Jones* v. *Richardson,* 9 Cal.App.2d 657 [50 P.2d 810]; see cases collected 21 Cal.Jur. p. 911, § 90; 43 Am.Jur., p. 86, § 274; 2 Shearman and Redfield on Negligence, p. 799, § 325.)

In the instant case, however, we are not controlled by the common law, but by section 86 of the charter. It provides: "Every officer who shall approve, allow or pay any demand on the treasury not authorized by law, . . . shall be liable to the city and county individually and on his official bond for the amount of the demand so illegally approved, allowed or paid." Good or bad faith is not mentioned, nor is any distinction made between ministerial or discretionary duties.

If section 86 intended to impose personal liability on public officials where they authorize or make such payments regardless of their good or bad faith, then the section is unconstitutional insofar as it attempts to impose such liability on the district attorney.

The district attorney is a county officer. Section 24000(a) of the Government Code so provides. ▮ For some purposes he is a state officer. (*Singh* v. *Superior Court,* 44 Cal. App. 64 [185 P. 985].) ▮ Even though San Francisco is a consolidated city and county, the district attorney re-

mains a county official. (*Kahn* v. *Sutro*, 114 Cal. 316 [46 P. 87, 33 L.R.A. 620]; *Dineen* v. *San Francisco*, 38 Cal. App.2d 486 [101 P.2d 736].)

■ It is elementary law that a charter provision relating to county officials is valid only if authorized by the state Constitution. In this respect, the authority as to consolidated cities and counties must be found if it exists in article XI of the Constitution, and particularly in section 8½. There are many cases holding that San Francisco cannot regulate county officers unless authority is found in section 8½. Thus, in *Nicholl* v. *Koster*, 157 Cal. 416 [108 P. 302], San Francisco attempted to fix the compensation of assistant county probation officers. At that time section 8½ conferred no such authority. It was held that the city did not possess this authority. Subsequently section 8½ was amended to confer such authority. •

Similarly, in *Crowley* v. *Freud*, 132 Cal. 440 [64 P. 696], San Francisco attempted to fix the qualifications of deputies in certain county offices. At that time section 8-½ did not expressly confer that power. It was held that San Francisco possessed no such power. This, too, resulted in an express amendment to section 8½ conferring the power to fix such qualifications.

In *Kahn* v. *Sutro*, 114 Cal. 316 [46 P. 87, 33 L.R.A. 620], San Francisco attempted to regulate the election of its district attorney and some other county officers contrary to the general state law. Since no such power was then contained in the Constitution, it was held that San Francisco had no such power. A subsequent amendment now confers that power.

Section 8½ of article XI in no way authorizes a consolidated city and county to fix the *liability* of its county officers. The pertinent provision is subdivision 4 of section 8½. So far as here pertinent, it provides: "It shall be competent in any charter framed in accordance with the provisions of this section, or section eight of this article, for any city or consolidated city and county, and plenary authority is hereby granted, subject only to the restrictions of this article, to provide therein or by amendment thereto, the manner in which, the method by which, the times at which, and the terms for which the several county and municipal officers and employees whose compensation is paid by such city or city and county, excepting judges of the superior court, shall be elected or appointed, and for their recall and removal,

and for their compensation, and for the number of deputies, clerks and other employees that each shall have, and for the compensation, method of appointment, qualifications, tenure of office and removal of such deputies, clerks and other employees.''

There is nothing in this section or in any other provision of the Constitution authorizing a consolidated city and county to prescribe the liabilities of county officers in general and of the district attorney in particular.

If the approval of section 86 of the charter by the Legislature be looked upon as making the section a general law of the state, such would be special legislation and violative of article IV, section 25, subsection 33, of the Constitution. It is well settled that the Legislature cannot, by statute, create or impose rights or liabilities on the officers or employees of one county not imposed on the officers and employees of all counties. (*Welsh* v. *Bramlet,* 98 Cal. 219 [33 P. 66]; *Payne* v. *Murphy,* 18 Cal.App. 446 [123 P. 350]; *Pratt* v. *Browne,* 135 Cal. 649 [67 P. 1082]; *City of Pasadena* v. *Stimson,* 91 Cal. 238 [27 P. 604]; *Chitwood* v. *Hicks,* 219 Cal. 175 [25 P.2d 406]; *Hollman* v. *Warren,* 32 Cal.2d 351 [196 P.2d 562].)

Thus it is quite clear that section 86 is invalid insofar as it attempts (if it does attempt) to impose absolute liability on the district attorney for erroneous discretionary acts performed in good faith within the scope of his authority, without malice, corruption or sinister motives. As already pointed out, there is no such liability at common law, and there is no general statute imposing such liability. The general law authorizes boards of supervisors to supervise the conduct of all county officers and to direct prosecutions for delinquencies. (Gov. Code, § 25303.) The district attorney is authorized to bring suit against persons unlawfully receiving money to recover the money paid, plus a penalty. (Gov. Code, § 26525.) This action lies against the person receiving the money, not the person allowing it. '(*County of Santa Barbara* v. *Janssens,* 177 Cal. 114 [169 P. 1025, L.R.A. 1918C 558]; *Merriam* v. *Board of Supervisors,* 72 Cal. 517 [14 P. 137].) There may be other sections dealing with the same subject matter, but we have found no general law, and have been referred to none, imposing liability on a county officer who in good faith erroneously allows a claim where money is available to pay it.

Galli argues that Brown has waived this constitutional point because he did not raise it in the trial court. The point is without merit. The complaint here involved does not charge bad faith on the part of Brown, and without such an allegation the complaint is fatally defective—a point that can be raised at any time.

Galli also contends that by virtue of sections 6, 7, 8 and 8½ of article XI of the Constitution, San Francisco has been granted home rule and has complete control of its municipal affairs. That is undoubtedly true, but, as already pointed out, the regulation of the liability of the district attorney is not a municipal affair. While section 86 of the charter may be paramount to state law as to municipal affairs, it is not paramount as to matters of state concern. Brown, in appointing Garety, was acting as a county officer, and the verification of the payrolls was the performance of an act as a county officer. There is nothing in *Rand v. Collins*, 214 Cal. 168 [4 P.2d 529], so strongly relied upon by Galli, to the contrary. The Supreme Court in that case simply held that the Constitution (art. XI, §§ 7½ and 8½) authorized San Francisco to provide by charter that certain offices should be appointive—it did not decide that without such authority San Francisco would possess such power.

### Liability of the Controller and Treasurer

 The determination that Garety and Mullins were properly appointed under section 30 of the charter necessarily determines, so far as Mullins is concerned, that the payments made to him were lawful. The payments to Garety, because of his lack of residence, were not lawful. Nevertheless, the trial court found that while the approval by Brown of these salary payments was illegal, the "allowance" of such claims by the controller and their "payment" by the treasurer were authorized by law and not such as to impose liability on the controller and treasurer. Thus, the trial court found that, although the payments were illegal, the controller and treasurer were not liable therefor. Galli appeals.

The determination of this question by the trial court was undoubtedly correct. Liability is sought to be imposed under section 86 of the charter, above quoted. It is Galli's theory that Brown "approved," the controller "allowed" and the treasurer "paid" the salary demands and all are therefore liable. This theory is not sound. The charter does not purport to make the controller and treasurer guarantors of the

validity of the appointment of every employee. It simply requires them to warrant that the steps required by the charter have been followed. So far as the controller and treasurer are concerned, these salary claims were paid in precise conformity with the charter.

Section 150 of the charter provides:

"All personal services shall be paid by warrants on the basis of a claim, bill, timeroll or payroll approved by the head of the department or office employing such service. The . . . payrolls . . . for each department or office . . . shall be transmitted to the civil service commission before presentation to the controller.

"The secretary of the commission shall examine and approve such payroll for all persons legally appointed to or employed in positions legally established under this charter. The payrolls thus approved, with notation of any item thereof disapproved, shall then be certified by the secretary of the commission and transmitted by him to the controller. The controller shall not approve and the treasurer shall not pay any claim for personal services, . . . unless the same shall have been approved by the said secretary." The secretary of the civil service commission is not a party to these proceedings.

Section 73 of the charter requires the enumeration of all positions in the city and county employ in an annual appropriation ordinance and then provides: "The said ordinance shall constitute the legal basis for check by the civil service commission or the controller as to the legality of the creation of any position in the city and county service and the rate of compensation fixed therefor."

These sections must be read with section 86. So read, it is too apparent to require extended discussion that the controller and treasurer are not required to hold hearings and pass upon the legality of each appointment, but are simply required to see to it that payments are not made unless they comply with the procedure set up in the charter. The duty is placed on the head of the department to approve the payroll. He certifies by such approval to the legality of the appointment. The secretary of the commission then certifies that the person is legally appointed to a legally established position. The controller is not required to go beyond these certifications. He must check the annual salary ordinance to see if the position described is included, and must ascertain whether the rates of pay are as there set forth, but,

having done that, he is authorized to issue and the treasurer to pay the warrant.

In the instant cases all payrolls were approved by the duly authorized agent of Brown, and were certified by the secretary of the civil service commission. The controller admittedly checked each payroll against the salary ordinance and ascertained that such position was set forth in the ordinance, and that the rates of pay were within the limits there described. Warrants were issued and paid. The controller and treasurer did everything required of them by the charter. So far as they are concerned, every payment was in precise conformity with the charter. They were legally entitled to rely upon the allowance by Brown and the certification by the secretary of the civil service commission. Under no theory are they liable.

The appeals by Brown from the orders denying his motions for new trials are dismissed; the portions of the judgments involved on the appeals by Brown are reversed; the portions of the judgments involved on the appeals by Galli are affirmed.

Bray, J., and Wood (Fred B.), J., concurred.

A petition for a rehearing was denied June 6, 1952, and plaintiff and appellant's petition for a hearing by the Supreme Court was denied June 26, 1952.