[Civ. No. 15434.   First Dist., Div. Two.   July 27, 1953.]

FREDERICK J. DENTON, Respondent, v. CITY AND COUNTY OF SAN FRANCISCO et al., Appellants.

370

Dion R. Holm, City Attorney, Jack G. McBride, Deputy City Attorney, and A. Dal Thomson, Public Utilities Counsel, for Appellants.

John W. Broad for Respondent.

DOOLING, J.—Respondent Denton was a conductor with the Market Street Railway when that utility was acquired by the city and county of San Francisco in 1944, his employment with the acquired utility having been continuous since 1915. When the city and county acquired the utility respondent was working on the No. 40 line and continued to

work on the same line thereafter. The cars on this line started their initial run from San Francisco and were returned to San Francisco at the conclusion of their final run but otherwise they were operated between Daly City and San Mateo in San Mateo County. Denton was at the time of the acquisition of the utility and has ever since been a resident of San Mateo County. The No. 40 line was discontinued by the city and county on January 15, 1949, and thereafter the respondent was employed on a line operated entirely within the limits of the city and county of San Francisco.

On January 8, 1951, respondent was suspended. He was returned to work on January 16th and again suspended on January 23d. On February 16, 1951, he was given written notice by the manager of utilities that charges had been preferred against him of insubordination and inattention to duties in that ''you have not been a resident of the City and County of San Francisco as defined by Section 7 of the Charter . . . and that you have not . . . until the 24th day of January, 1951, been in possession of authorization to reside outside the City and County . . . as required by said Charter section.'' A hearing on these charges was held on February 21, 1951, before the manager of utilities and on February 28th respondent received written notice signed by such manager which states: ''I have decided that it is for the best interests of the Municipal Railway of San Francisco to discharge you from its service for insubordination and inattention to duties. You are, therefore, hereby discharged.'' The respondent was thereby faced with discharge after over 35 years of continuous service and when he was within a short time of retirement with the attendant retirement benefits conferred by the charter.

Respondent appealed this order to the civil service commission pursuant to section 154 of the charter and the civil service commission after considering the appeal filed its order in writing ''that the penalty of dismissal be and is hereby modified to suspension without pay from January 24, 1951, to June 8, 1951.''

Despite this order of the civil service commission the controller refused to issue his warrants to respondent and the municipal railway refused to reinstate him to his position. He brought this action in the superior court for a writ of mandate and that court issued its writ ordering his rein-

statement and the payment to him of his accrued wages for the entire period.

The crux of the case lies in the proper interpretation of certain sections of the San Francisco charter. Section 7 of the charter requires all officers and employees of the city and county to be residents thereof and provides that any such officer or employee "upon ceasing to be such resident, shall be removed from such office or employment." It contains this proviso: "provided, however, that any officer or employee . . . may live outside the City and County of San Francisco upon the authorization of the director of health, filed in the office of the civil service commission, and granted on account of the ill health of said officer or employee or the ill health of a member of the immediate family of said officer or employee."

Section 125 of the charter provides that employees of any public utility acquired by the city and county who have been employed by such utility for at least one year shall be continued in their respective positions. It contains the following provision: "All persons residing outside the City and County claiming the benefit of this provision and *who are not engaged on such utility work outside of the limits of the city and county* shall be allowed a reasonable time, not exceeding one year, to become residents of the City and County." (Emphasis ours.)

██ Respondent testified that because his run on the No. 40 line was in San Mateo County he believed that he was not required to live in the city and county after that line was acquired by the city and county. This belief was justified not only by the language of section 125 above emphasized but by the administrative construction placed upon that language by the civil service commission. In the record of the hearing before the manager of utilities is a letter from the secretary of the civil service commission containing this statement: "Following the consolidation, Herman Behlendorff, then a resident of Burlingame, was excused from the necessity of establishing a residence in San Francisco because of the fact that a portion of his duties were related to the operation of the No. 40 line which then had its terminus in San Mateo."

The only reasonable construction to be placed on the portion of section 125 which we have emphasized is that employees of an acquired utility engaged "on such utility work outside of the limits of the city and county" were not re-

quired to become residents of the city and county in order to retain their positions; and by the administrative construction above referred to this was the actual interpretation placed upon this language with specific reference to the No. 40 line on which respondent was engaged.

In 1945, at the request of a superior, respondent gave the municipal railway a San Francisco address but he actually continued to live in San Mateo and his superior was advised that the San Francisco address was only a mailing address and not his residence. He testified that in doing this he was just doing what he was told to do. In 1948 he removed his home from San Mateo to Burlingame and registered the Burlingame address with the municipal railway. He removed from San Mateo to Burlingame because: "My wife was very, very sick, very, very nervous; I had to move her to a quieter neighborhood. The doctor told her to get away from the noise, and get a quieter neighborhood. She was very, very nervous, she didn't feel well and we had to move to a quieter neighborhood under the doctor's orders."

Thus when the operation of the No. 40 line was discontinued and respondent was put to work exclusively inside San Francisco he had a Burlingame residence address on file with the municipal railway. No one told him then that he was required to move to San Francisco by reason of the discontinuance of the No. 40 line, and he continued to get monthly bulletins from the municipal railway which were mailed to his Burlingame address and occasional telephone calls concerning his work from the office of the municipal railway to his home in Burlingame.

At the time of his suspension in January, 1951, respondent was informed that it was because of his residence outside of San Francisco and was advised of the necessity of getting a health authorization if his living outside of San Francisco was justified for that reason. He procured a doctor's certificate that his wife's health required her to live outside San Francisco and presented it on January 15, 1951. The authorization of the director of health permitting respondent to live outside San Francisco on account of the ill health of his wife was filed with the civil service commission on January 24, 1951, and at the time of trial this authorization had been renewed (apparently in compliance with an administrative rule requiring such authorization to be renewed every six months).

■ Thus the record of the administrative hearing before the manager of utilities and the civil service commission on appeal established that respondent's residence in San Mateo County was authorized by section 125 of the charter at least up to January 15, 1949, when the No. 40 line was discontinued, since up to that time in the langauge of that section he was "engaged in such utility work outside of the limits of the city and county." It may be conceded that when respondent ceased to work outside the city and county limits the privilege of living outside those limits conferred by section 125 ceased. Certainly he then had a reasonable time to comply with the provisions of section 7 and either acquire a residence in San Francisco or obtain the necessary authorization of the director of health which would entitle him to live outside those limits. By analogy such a reasonable time might properly be measured by the provision of section 125 "not exceeding one year." The record is equally clear that neither before nor after the expiration of one year was respondent's attention called to these requirements, although his Burlingame residence was a matter of known record with the municipal railway during all of that period, until after he had been summarily suspended on January 8, 1951. He then almost immediately procured the necessary authorization of the director of health permitting him to reside outside of San Francisco because of his wife's ill health.

In passing upon the administrative action of the manager of utilities and the subsequent order of the civil service commission on appeal it is important to notice that under section 154 the civil service commission acts de novo on appeal and its order supersedes the order appealed from. Section 154 provides: "The civil service commission shall examine into the case and may require the appointing officer to furnish a record of the hearing and may require in writing any additional evidence it deems material, and may, thereupon make such decision as it deems just. The order or decision of the commission upon such appeal shall be final and shall forthwith be enforced by the appointing officer."

The superior court was therefore concerned with the order of the civil service commission in this case and not with the order of the manager of utilities. We stress this fact because the form of the two orders is important. ■ While neither the manager of utilities nor the civil service commission made findings of fact in the true sense the order of

the manager of utilities is consistent with a finding that respondent had violated the residence requirement of section 7 of the charter and the order of the civil service commission is inconsistent with a finding of such violation. This is so because there is only one penalty provided in section 7 for the violation of the residence requirement: the employee "upon ceasing to be such resident *shall be removed from such office or employment.*" (Emphasis ours.)

▆ Thus in support of the action of the civil service commission in ordering that respondent be not removed from his employment we must presume that the civil service commission found that respondent had not violated the residence requirement. If there is any substantial evidence in the record to support this implied finding of the civil service commission its conclusion in that regard must be affirmed.

Respondent suggests that this support may be found in the doctrine of estoppel. We are not prepared to hold that officials of the city and county could estop the city and county from insisting on compliance with a substantive provision of law requiring residence as a condition of employment. To so hold would be to permit such officials by indirection to accomplish what they could not do directly. ▆ However public bodies may be estopped from asserting mere procedural, as distinguished from substantive provisions of law. (*Farrell* v. *County of Placer*, 23 Cal.2d 624 [145 P.2d 570, 153 A.L.R. 323].) ▆ From the record before it the civil service commission might reasonably conclude that the condition of ill health of respondent's wife would have supported the authorization of the director of health for respondent to live outside of San Francisco at all times after the operation of the No. 40 line was discontinued and that but for the acquiescence of respondent's superiors in the face of their knowledge of his residence in Burlingame he might have earlier secured such authorization as he did without difficulty secure it once the necessity was called to his attention. The condition of ill health is the substantive requirement justifying residence outside of San Francisco. The filing of the authorization is a mere procedural requirement.

▆ There is as well an alternative ground to support the implied finding of the civil service commission. The same result may be reached by applying the doctrine of ratification. In *Mott* v. *Horstmann*, 36 Cal.2d 388 [224 P.2d 11], the superintendent of parks of the city of Oakland had accepted an appointment as a member of the Planning Commission of

Contra Costa County. In doing so he violated a provision of the Oakland charter that "No person holding any office or position under the City Government . . . shall, *except as may be authorized by the Council,* hold any such office or position under the City Government while holding any office, or position of profit, under the government of this State. . . ." (Emphasis ours.) Over a year after the park superintendent had accepted appointment to the Contra Costa County Planning Commission the Oakland city council adopted a resolution consenting to the prior appointment of the park superintendent to the Contra Costa Planning Commission and ratifying the same. The Supreme Court said: "Unquestionably the city council had the power under section 38 of the city charter to consent to the appointment of the petitioner as a member of the Planning Commission of Contra Costa County. It is the general rule that a governmental body may effectively ratify what it could theretofore have lawfully authorized. . . .

"The doctrine of ratification is subject to the limitation that the subsequent ratification should be made with the same formalities required for the original exercise of the power. (Restatement of Agency, § 93(2).) As the city council could have originally exercised its power of approval by resolution, it could and did effectively ratify by the same means." (36 Cal. 2d, p. 391.)

The analogy to the case in hand is close. The authorization provided for in section 7 of the charter may be accepted by the civil service commission in the same form retroactively as prospectively. This we must assume in support of its order the civil service commission elected to do.

Some point is attempted to be made of the fact that in its original order the civil service commission purported to confirm the findings of the manager of utilities. The original order read: "that the findings of the manager of utilities be and the same are hereby confirmed, but that the penalty of dismissal be and is hereby modified to suspension without pay from January 24, 1951 to June 8, 1951." By a subsequent order made one week later the commission deleted the words "the findings of the Manager of Utilities be and the same are hereby confirmed." Since the only "finding" of the manager of utilities found in the record is "I have decided that it is for the best interests of the Municipal Railway to discharge you for insubordination and inattention to duties" the civil service commission may well have considered that

in confirming this finding it might be held that it was confirming the decision "to discharge you," and that its order as originally worded was inconsistent on its face. In any event there was no express finding by anyone that respondent had violated the residence requirement and the penalty of the civil service commission's order is inconsistent with such a finding by it, as we have shown.

It was a part of the charge "that you have not until the 24th day of January, 1951, been in possession of authorization to reside outside the City and County." This was true, and even in the face of a holding of estoppel to rely on this failure to show a violation of the substantive residence requirement or of ratification or both, it nonetheless constituted a violation of a procedural requirement of the charter. The penalty of suspension from January 24th to June 8th may seem somewhat harsh for this purely technical violation of the charter but the administrative discretion lodged in the civil service commission is wide and they may have concluded that respondent should have been more alert to the requirements of the basic law under which he was employed and deserved the punishment assessed for this "inattention to duty." It is our conclusion that the trial court should have affirmed and enforced the civil service commission's order in toto.

The judgment is modified by striking therefrom the portion ordering the payment of respondent's wages from January 24, 1951, to June 8, 1951, and as so modified it is affirmed, without costs to either party.

Nourse, P. J., concurred.

A petition for a rehearing was denied August 26, 1953, and the following opinion was then rendered:

THE COURT.— In his petition for rehearing respondent argues that under section 154 of the San Francisco Charter the civil service commission has no jurisdiction to impose suspension. In our judgment respondent misreads the section. It provides for charges and a hearing before the appointing officer and contains this authorization: "The appointing officer shall publicly hear and determine the charges, and may exonerate, *suspend* or dismiss the accused." (Emphasis ours.) It then provides for an appeal by the accused to the civil service commission which "may, thereupon, make such decision as it deems just." We think it clear

that the civil service commission's power on appeal is as broad as that of the appointing officer and it, too, "may exonerate, *suspend* or dismiss the accused."

█ In the final paragraph of section 154 an additional provision is made: "The appointing officer may, for disciplinary purposes, suspend a subordinate for a period not exceeding thirty days . . . The suspended employee shall be notified in writing of the reason for such suspension, and if the suspension be for more than five days the employee shall, at his request, be given a hearing by the appointing officer. The decision of the appointing officer in all cases of suspension for disciplinary purposes shall be final."

Respondent argues that this limits the power of suspension in all cases to 30 days and makes the decision of the appointing officer in all cases of suspension final. We do not so read the section.

The first portion of the section provides generally for written charges and a hearing as a result of which the appointing officer "may exonerate, *suspend* or dismiss." After such a hearing the employee is given the unqualified right of appeal to the civil service commission. The last paragraph provides for a more summary disciplinary proceeding under which the appointing officer may suspend for not more than 30 days with no right to a hearing, unless demanded, and no right of appeal. The limit of 30 days is placed upon disciplinary suspensions imposed in this more summary fashion and not upon the suspensions provided for after the more formal procedure under which a hearing must be given and the right of appeal to the civil service commission is allowed.

█ The civil service commission "being a 'local' board as distinguished from a board exercising statewide jurisdiction, the superior court was not authorized to exercise its independent judgment on the evidence." The superior court had not the power of trial de novo, the limit of the court's power in this case being to determine whether the decision of the civil service commission is supported by substantial evidence. (*Corcoran* v. *San Francisco etc. Retirement System*, 114 Cal.App.2d 738, 740-741 [251 P.2d 59].)