[L.A. No. 30100. In Bank. Oct. 2, 1973.]

SILAS ECTOR, Plaintiff and Appellant, v.
CITY OF TORRANCE et al., Defendants and Respondents.

## COUNSEL

Kurlander, Solomon & Hart, Stephen Warren Solomon and Ronald L. Gould for Plaintiff and Appellant.

Carroll, Burdick & McDonough, Christopher Burdick, Jacobs, Blanckenburg, May & Colvin and Reynold H. Colvin as Amici Curiae on behalf of Plaintiff and Appellant.

Stanley E. Remelmeyer, City Attorney, and Ralph H. Nutter for Defendants and Respondents.

Roger Arneberg, City Attorney (Los Angeles), John A. Daly, Jack L. Wells, Assistant City Attorneys, Thomas M. O'Connor, City Attorney (City and County of San Francisco), Burk E. Delventhal, Deputy City Attorney, Edward A. Goggin, City Attorney (Oakland), and William C. Sharp, Deputy City Attorney, as Amici Curiae on behalf of Defendants and Respondents.

## OPINION

**MOSK, J.**—This is an appeal by a former city employee from a judgment denying his petition for writ of mandate to compel respondent City of Torrance to vacate its order terminating his employment and to reinstate him with full back pay. Appellant contends that the requirement of respondent's charter that its officers and employees reside within its borders contravenes a state statute forbidding such a job qualification (Gov. Code, § 50083) and denies him certain constitutional rights. We conclude that neither of appellant's points is well taken and hence that the judgment must be affirmed.

Respondent City of Torrance is a charter city. Article VII, section 6, of its charter declares that "All officers and employees of the City of Torrance shall be or become residents of said City within six (6) months after their appointment or date of employment provided, however, that as to appointive officers or employees having technical, special or professional knowledge or abilities, the City Council may waive the residence requirements. No officer or employee may be appointed permanently in the classified service unless and until he has become a resident of the City."

In 1968 appellant was employed by respondent as a librarian, and in

the following year received an appointment in the city's classified civil service. He never became a resident of Torrance, however, and in 1971 he was discharged for violation of the residence requirement of article VII, section 6.[1] He brought this action in administrative mandamus, challenging the validity of the residence requirement. The trial court upheld the provision and denied relief.

Appellant contends that Government Code section 50083 prohibits respondent from requiring residence as a condition of employment. Section 50083 provides in its entirety that "No local agency or district shall require that its employees be residents of such local agency or district." Appellant relies on section 50001 of the same code, which declares generally that " 'Local agency' as used in this division [i.e., including § 50083] means county, city, or city and county, unless the context otherwise requires." It is urged that respondent is a "city" within the definition of section 50001 and hence is bound by the prohibition of section 50083. ▮ As will appear, however, when the legislation is read together with certain governing provisions of the Constitution "the context otherwise requires" a more limited meaning for the term "local agency" in section 50083: i.e., when the agency in question is a city, the section is intended to apply only if it is a general law city rather than a charter city. Respondent, as noted above, is the latter.

To begin with, this is not the usual case in which the courts are without constitutional guidance in resolving the question whether a subject of local regulation is a "municipal affair" and hence within the general home rule power vested in charter cities by subdivision (a) of section 5, article XI, of the Constitution.[2] (See, e.g., *Bishop* v. *City of San Jose* (1969) 1 Cal.3d 56, 62 [81 Cal.Rptr. 465, 460 P.2d 137], and cases cited.) Here we have the benefit of a specific directive in subdivision (b) of that section, which grants "plenary authority" to charter cities to prescribe in their charters the "qualifications" of their employees.[3] A requirement that a municipal

---

[1]Appellant thereafter found similar employment with the City of Azusa.

[2]The cited provision reads: "It shall be competent in any city charter to provide that the city governed thereunder may make and enforce all ordinances and regulations in respect to municipal affairs, subject only to restrictions and limitations provided in their several charters and in respect to other matters they shall be subject to general laws. City charters adopted pursuant to this Constitution shall supersede any existing charter, and with respect to municipal affairs shall supersede all laws inconsistent therewith."

[3]The cited provision reads: "It shall be competent in all city charters to provide, in addition to those provisions allowable by this Constitution, and by the laws of the State for: (1) the constitution, regulation, and government of the city police force; (2) subgovernment in all or part of a city; (3) conduct of city elections and (4) *plenary authority is hereby granted,* subject only to the restrictions of this article,

employee reside within the borders of the city that hires and pays him has long been deemed a "qualification" for the employment in question, similar in this regard to minimum standards of age, health, education, experience, or performance in civil service examinations. (*Marabuto* v. *Town of Emeryville* (1960) 183 Cal.App.2d 406, 410-411 [6 Cal.Rptr. 690]; *Galli* v. *Brown* (1952) 110 Cal.App.2d 764, 775 [243 P.2d 920]; *Dierssen* v. *Civil Service Commission* (1941) 43 Cal.App.2d 53, 57 [110 P.2d 513]; cf. *Ballf* v. *Public Welfare Department* (1957) 151 Cal.App.2d 784, 788 [312 P.2d 360]; *Denton* v. *City & County of San Francisco* (1953) 119 Cal.App.2d 369, 375 [260 P.2d 83].)[4]

■ It follows that a statute purporting to prohibit charter cities from prescribing municipal employee residence requirements in their charters would contravene that explicit constitutional authorization. We must presume that in adopting section 50083 the Legislature intended to enact a valid statute (*In re Kay* (1970) 1 Cal.3d 930, 942 [83 Cal.Rptr. 686, 464 P.2d 142]), and therefore meant to limit its reach to general law cities.

In the present context, moreover, the presumption is confirmed by legislative history. Section 50083 was enacted in the 1970 session. In the immediately following session Assembly Bill 1935 was introduced, proposing to expand section 50083 by declaring that " 'Local agency' for the purpose of this section includes charter cities and charter counties." Obviously aware of the constitutional prohibition against his proposal, the author of this bill simultaneously introduced Assembly Constitutional Amendment 53, which would have added the following exception to subdivision (b) of section 5, article XI (*ante,* fn. 3): "No provision of this article shall limit the power of the Legislature to prohibit charter cities from imposing a residence requirement upon their employees as a qualification for employment."[5]

After passing the Assembly in an amended form, Assembly Bill 1935

---

to provide therein or by amendment thereto, the manner in which, the method by which, the times at which, and the terms for which the several municipal officers and employees whose compensation is paid by the city shall be elected or appointed, and for their removal, and for their compensation, and for the number of deputies, clerks and other employees that each shall have, and for the compensation, method of appointment, *qualifications,* tenure of office and removal of such deputies, clerks and other employees." (Italics added.)

Until the 1970 revision of this portion of the Constitution, similar language appeared in former article XI, section 8½.

[4]The rule was applied more than half a century ago in *Hellyer* v. *Prendergast* (1917) 176 App.Div. 383 [162 N.Y.S. 788, 790].

[5]The amendment would also have added an identical exception to the provision governing charter counties (art. XI, § 4, subd. (f)).

was further amended in the Senate to exclude from its reach "a charter city and county"—i.e., San Francisco—and "charter cities of over 2,000,000 population"—i.e., Los Angeles. The measure was debated on the floor and narrowly defeated on its third reading by a roll call vote of 13 to 12. (5 Sen. J. (1971 Sess.) pp. 9242, 9247.) We may reasonably infer that by so voting the Legislature rejected the very extension of the statute which appellant now asks us to adopt under the guise of judicial construction. This, of course, we may not do.

Appellant also contends that the residence requirement of respondent's charter is unconstitutional.[6] In *Detroit Police Officers Assn.* v. *City of Detroit* (1971) 385 Mich. 519 [190 N.W.2d 97], a similar municipal employee residence requirement was sustained against a charge that it violated the equal protection clause of the Fourteenth Amendment. An appeal was taken to the United States Supreme Court, but that court ordered the matter "dismissed for want of substantial federal question." (405 U.S. 950 [31 L.Ed.2d 227, 92 S.Ct. 1173].) Shortly thereafter a federal circuit court of appeals held that the dismissal amounted to a decision on the merits by the United States Supreme Court that such a municipal employee residence requirement does not violate any provision of the federal Constitution. (*Ahern* v. *Murphy* (7th Cir. 1972) 457 F.2d 363.) The rule of construction invoked by the *Ahern* court has been recognized in California decisions. (*Samson Market Co.* v. *Alcoholic Bev. etc. Appeals Bd.* (1969) 71 Cal.2d 1215, 1221, fn. 4 [81 Cal.Rptr. 251, 459 P.2d 667]; *People* v. *Superior Court* (1972) 28 Cal.App.3d 600, 619-620 [104 Cal. Rptr. 876].) Applied here, it leads us to reject this attack on the validity of respondent's residence requirement.

We need not, however, rest our conclusion exclusively on the foregoing reasoning. In addition to the *Detroit Police Officers Assn.* case, a number of other decisions have held that a municipal employee residence requirement bears a rational relationship to one or more legitimate state purposes, and hence is constitutional under the traditional equal protection test. (See, e.g., *Hattiesburg Firefighters Local 184* v. *City of Hattiesburg* (Miss. 1972) 263 So.2d 767; *Williams* v. *Civil Service Com'n of City of Detroit* (1970) 383 Mich. 507 [176 N.W.2d 593, 596-598]; *Mercadante* v. *City of Paterson* (1970) 111 N.J.Super. 35 [266 A.2d 611] affd. per curiam (1971) 58 N.J. 112 [275 A.2d 440]; *Salt Lake City Fire Fighters Local 1645* v. *Salt Lake City* (1969) 22 Utah 2d 115 [449 P.2d 239, 240]; *Marabuto* v. *Town of Emeryville* (1960) *supra,* 183 Cal.App.2d 406; *Kennedy* v. *City of Newark* (1959) 29 N.J. 178 [148 A.2d 473, 475-476].)

---

[6]See generally Comment, *Residency Requirements for Municipal Employees: Denial of a Right to Commute?* (1973) 7 U.S.F. L.Rev. 508.

■ Among the governmental purposes cited in these decisions or now urged by amici curiae are the promotion of ethnic balance in the community; reduction in high unemployment rates of inner-city minority groups; improvement of relations between such groups and city employees; enhancement of the quality of employee performance by greater personal knowledge of the city's conditions and by a feeling of greater personal stake in the city's progress; diminution of absenteeism and tardiness among municipal personnel; ready availability of trained manpower in emergency situations; and the general economic benefits flowing from local expenditure of employees' salaries. We cannot say that one or more of these goals is not a legitimate state purpose rationally promoted by the municipal employee residence requirement here in issue.

■ Appellant contends in the alternative that respondent's residence requirement must be judged by the "strict" equal protection test, i.e., must be shown to be "necessary" to promote a "compelling" governmental interest. To justify invoking the strict standard of scrutiny, appellant proposes a number of "fundamental rights" which he asserts are curtailed by the provision in question.

First it is said that the residence requirement impinges on appellant's "right to travel." The contention is not persuasive. Viewed realistically, appellant is claiming the right to "travel" between his home and his place of employment each morning and evening of each working day—in other words, a "right to commute." We cannot discern such a right in the United States Supreme Court decisions relied on by appellant. Clearly the cultural and educational rewards of international travel (*Kent* v. *Dulles* (1958) 357 U.S. 116, 126-127 [2 L.Ed.2d 1204, 1210-1211, 78 S.Ct. 1113]) are not reaped from routine daily trips of a harassed metropolitan commuter. Nor have such trips any relevance whatever to the right to migrate among the several states for the purpose of starting a new life without fear of being denied welfare if a job is not immediately available (*Shapiro* v. *Thompson* (1969) 394 U.S. 618 [22 L.Ed.2d 600, 89 S.Ct. 1322]), or to the right to move within the confines of a state for the same purpose without fear of being denied prompt access to public housing facilities (*King* v. *New Rochelle Municipal Housing Authority* (2d Cir. 1971) 442 F.2d 646; *Cole* v. *Housing Authority of City of Newport* (1st Cir. 1970) 435 F.2d 807). Each of the latter decisions invalidated not a residence requirement as such but a *durational* residence requirement, i.e., a requirement that the migrant not only be a resident but maintain that status for a certain minimum period of time before he qualifies for benefits.[7] There is no similar

[7] On almost every page of its lengthy analysis in *Shapiro* (394 U.S. at pp. 627-642 [22 L.Ed.2d at pp. 610-619]) the high court characterizes this precondition as a "waiting-period requirement."

"waiting period" in the provision before us, but simply a requirement of residence in the community in order to be a municipal employee. Nothing in *Shapiro* or any of its progeny stands for the proposition that an indigent may demand public assistance without being a bona fide resident of the state or locality to which he has migrated. (See also *Dunn* v. *Blumstein* (1972) 405 U.S. 330, 334 [31 L.Ed.2d 274, 279, 92 S.Ct. 995] [state cannot require unreasonable period of residence as precondition to exercise of right of suffrage, but can require actual residence at time of voting]; *Thompson* v. *Mellon* (1973) 9 Cal.3d 96, 106 [107 Cal.Rptr. 20, 507 P.2d 628] [same rule governs right to be a candidate for public office].) Indeed, the provision here challenged does not even require immediate residence, but gives each employee six months in which to "become" a resident of respondent city—i.e., the exact converse of a waiting period.[8]

Appellant suggests other fundamental rights said to be affected by respondent's residence requirement. He asserts that it violates his right to "marry, establish a home, and bring up children" because it "limits the options" as to the setting—urban or suburban, multiple or single-family dwelling—in which he may choose to accomplish these objectives. He also argues that it impairs his freedom of association because it forces him to live among neighbors "who may be less congenial or less interesting than those in other localities." And he urges that it invades his right of privacy because the choice of where to locate a residence "is a decision about which one has a 'reasonable expectation' of privacy."

Not surprisingly, appellant is able to cite no authority supporting these somewhat esoteric claims. It is self-evident from appellant's proffered justifications that he is stretching his case mightily to bring it within the scope of the named fundamental rights. The critical question whether a legislative act is to be denied the presumption of validity and subjected to strict judicial scrutiny does not turn on the ingenuity of counsel in conceiving remotely possible ways in which the act might affect those rights. Appellant need not necessarily prove he was wholly denied the rights he now invokes, but he must at least show that his exercise of those rights was actually and significantly impaired.

Instead, appellant asks us in effect to declare a fundamental right to be "let alone" in the choice of his place of residence. We are not unsympathetic to that Thoreauvian goal, although we fear that in this day of land-use planning, zoning, and environmental controls, it may be increasingly

---

[8]These distinctions were apparently not perceived in the two cases contrary to our conclusion on this point. (*Krzewinski* v. *Kugler* (D.N.J. 1972) 338 F.Supp. 492, 497-498; *Donnelly* v. *City of Manchester* (1971) 111 N.H. 50 [274 A.2d 789].)

difficult to achieve. Nevertheless, as Chief Justice Weintraub of New Jersey explained, in this type of case "The question is not whether a man is free to live where he will. Rather the question is whether he may live where he wishes and at the same time insist upon employment by government." (*Kennedy* v. *City of Newark* (1959) *supra,* 148 A.2d 473, 476.) No such "fundamental right" is expressed or implied in the Constitution, and it is not the province of the courts to create substantive constitutional rights in the name of guaranteeing equal protection of the laws. (*San Antonio School District* v. *Rodriguez* (1973) 411 U.S. 1, 33 [36 L.Ed.2d 16, 43, 93 S.Ct. 1278].)

■ Finally, appellant points to the fact that article VII, section 6, of respondent's charter provides in part that "as to appointive officers or employees having technical, special or professional knowledge or abilities, the City Council may waive the residence requirements." The named group, argues appellant, amounts to a "classification according to occupational status," which in turn must be deemed a "suspect classification" requiring application of the strict equal protection test. Again no authority is cited. The cases holding wealth, race, and alienage to be suspect classifications are manifestly distinguishable. In the present record there is neither allegation nor proof that respondent's residence requirement is being used to unlawfully discriminate against the poor or against racial or national minorities. Authorization to make the challenged exception from the residence requirement, if and when necessary, merely reflects the reality that positions calling for specialized personnel are by definition more difficult for a city to fill than ordinary municipal jobs. Municipal employee residence requirements often contain similar authorizations of waiver for reasons of ill health or severe financial hardship, but none has been held to create "suspect classifications" among the employees affected. The same rule should apply here.

The judgment is affirmed.

Wright, C. J., McComb, J., Tobriner, J., Burke, J., and Clark, J., concurred.