In re Petition for Removal of Paul Rice and Petition for Removal of Burton Melvin, as Commissioners of the City of West Frankfort, Illinois.

Kenneth R. Patton, et al., Petitioners-Appellees, v. Paul Rice and Burton Melvin, Objectors-Appellants. (Cases Consolidated for Trial and Appeal by Stipulation of Parties and Order of County Court.)

Gen. No. 61–O–23.

Fourth District.

March 12, 1962.

 █

Trobaugh & Brondos, of West Frankfort, and Lewis & Lewis, of Benton (Frank E. Trobaugh and Loren E. Lewis, of counsel), for appellant.

Craig & Craig, of Mt. Vernon (Howard W. Campbell, Glen E. Moore, Ronald W. Polston, of counsel), for appellee.

HOFFMAN, PRESIDING JUSTICE.

Two separate recall petitions were filed under former Section 19–58 of the Cities and Villages Act (now Section 4–7–2, 1961 Ill Rev Stats) demanding the election of successors to Paul Rice and Burton Melvin, incumbent Commissioners of the City of West Frankfort. Both Commissioners filed objections challenging the sufficiency of the petitions. After a hearing, the County Court of Franklin County decreed that each petition was sufficient and ordered the City Council to fix the time for holding the election provided by this statute.

It is from this decree that the Commissioners appeal to this court. They contend that the petitions are insufficient because they were not executed in conformity with the provisions of Section 19–58 of the Cities and Villages Act in the following respects:

(a) They were not sworn to.

(b) The affidavits were false.

(c) The signatures signed by mark should not be counted.

(d) The signatures not in the handwriting of the signers should not be counted.

(e) Those signatures should not be counted where the signers did not write their residences and dates of signing opposite their name.

In both petitions, the same charges of misconduct in office were set forth. The Commissioners filed identical objections to the validity of the petitions. The hearing in the County Court on the two petitions was consolidated, it being stipulated that the evidence should be considered, where applicable, to both cases. Both matters have been consolidated for appeal in this court.

The petition against Commissioner Rice contained 161 sheets and the petition against Commissioner Melvin consisted of 159 sheets. The Melvin petition contained 2612 signatures, and the Rice petition 2628 signatures. The statute provides that the petition contain signatures amounting to at least 55 per cent of the number of votes cast for mayor in the last quadrennial municipal election. See: Ill Rev Stats 1959, chap 24, sec 19–58. Based thereupon, the number of signatures required to recall in this case was 2462.

The parties stipulated that after deducting for signatures withdrawn and for non-resident signatures, it appeared that there remained on the Rice petition 136 signatures over and above the amount required, and on the Melvin petition there was an overage of 121 signatures. Thus, insofar as the signatures are concerned, in order to invalidate the Rice petition there would have to be a determination that least 137 signatures were invalid, while on the Melvin petition 122 invalid signatures would have to be found.

It is first argued by the Commissioners that the petitions should be rejected in toto because they were not sworn to as required by law. The claim is based upon the argument that no oaths were administered by any

of the notaries public who acknowledged the signatures of those who circulated the petitions.

The statute provides the form of affidavit and prescribes that it be "signed by a resident of the municipality in which the signers of the sheet reside." The statute then provides that "This affidavit shall be sworn to before an officer, residing in the county in which the municipality is located, who is qualified to administer oaths therein." Although each sheet of the petitions involved here contained a duly executed and notarized affidavit in the form provided, the Commissioners argue that the method of administering the oath to the circulator did not conform to the requirements of Chapter 101, Section 3, which is as follows:

> "Whenever any person shall be required to take an oath before he enters upon the discharge of any office, place or business, or on any other lawful occasion, it shall be lawful for any person empowered to administer the oath to administer it in the following form, to-wit: The person swearing shall, with his hand uplifted, swear by the everliving God, and shall not be compelled to lay the hand on or kiss the gospels."

The three notaries involved, Clyde M. Lewis, Robert H. Ritchason and Eileen Patton were called to testify. Clyde M. Lewis, who signed most of the sheets, stated that he did not have the circulators raise their hands, but that he asked them if they swore the signatures were made in their presence and at the time shown. They all said, "Yes." He stated that the people came into his office and that he acknowledged their signatures; that each circulator signed the sheet in his presence. He testified he saw the oath of verification on the papers and that his intent was to "notarize" the signatures of the circulators; that that was

the only purpose those people came in to see him. One of the circulators, Thora Swofford, said that notary Lewis looked the petition over first and asked if she, Swofford, would swear it was legal and that she said she would. Another circulator, Robert Sparks, said he signed "under oath" as administered by Notary Public Lewis and that his conscience charged him with the duty to tell the truth.

The second notary public, Robert H. Ritchason, who signed three sheets of both petitions, stated that the circulator came into his office and asked him to "notarize" his signature and that he did so after asking the circulator if the signers had signed in his presence. He testified that in each case "I ask if it is a true thing, if they seen it done and asked them to sign in my presence." He likewise said he did not have the man hold up his right hand. The circulator signed in his presence and asked if he, the notary, would "notarize his signature." He didn't know if that would be called swearing or not. He stated that his only purpose was to notarize the signature "by the notary verification."

The third notary public, Eileen Patton, who only notarized one sheet containing 22 signatures on each petition, stated that the circulator came into her place of business and asked her to notarize the petition. Nothing else was said. The notary asked the circulator to sign and then she "notarized" it, that the circulator was not required to raise her hand. This notary said she did not read the affidavit over to the circulator and did not ask her to swear by the ever living God.

No Illinois case has been called to our attention, and we have found none, which prescribes the standard of conduct necessary to legally administer an oath in Illinois. Because so many transactions involving an oath occur daily in this state, both in business and

83

government, we have ourselves exhaustively searched the cases from the other jurisdictions to help us determine the rule which should be applicable here.

■ In general, it has been said that an oath is an appeal by a person to God to witness the truth of what he declares and in its broadest sense it includes any form of attestation by which a party signifies that he is bound in conscience to act truthfully. 67 CJS, Oaths and Affirmations, sec 2, p 4.

It is generally stated too that "Some unequivocal act, by which a person consciously takes on himself the obligation of an oath, is necessary to make a valid oath and to distinguish between an oath and a bare assertion or unsworn statement. While the uplifting of the hand is formal enough to make an oath legal and binding, the holding up of the hand is not necessary; it is sufficient if the person swearing does some corporal act after having been called on to do so and after his attention has been directed to the necessity of swearing to his statement, . . ." 67 CJS, Oaths and Affirmations, sec 6, p 8.

The latest case we examined was State v. Parker, 336 P2d 318, a 1959 Idaho Supreme Court case. There a deputy related facts to a justice of the peace concerning the defendant's driving of a motor vehicle while under the influence of intoxicating liquor. Based on these facts, the justice prepared a complaint and the deputy signed it and then handed it back to the justice who executed the jurat. There was no formal administration of the oath; the deputy didn't raise his hand nor take a verbal oath. The deputy testified that after he signed, the justice asked him "if that was the true facts as I knew it" and that in answering that it was, he, the deputy, felt in his conscience that he had taken on an obligation of an oath. The court held that this was a sufficient compliance with the statute requiring complaints to be under oath, citing as authority, State v. Anderson, infra.

In State v. Anderson, 178 Kan 322, 285 P2d 1073 (1955), a deputy sheriff went before a county judge and as a result of the statements he made, a complaint was prepared. The complaint stated "Duane Anderson, being duly sworn, on oath says . . ." After the complaint was prepared, it was executed by the deputy and a warrant was issued and a party arrested. In the prosecution for perjury against the deputy, he claimed that he wasn't under oath, as the judge, charged with administering the oath, signed the same in silence and made no statements to or asked him any questions. There was, at the time, a statute requiring the laying of the right hand on the Holy Bible in taking an oath. The court said, however, ". . . it is common knowledge that such requirements are not always complied with strictly. The question is whether under the circumstances what was done was a nullity." The court pointed out that the deputy read it after the judge prepared it and further, commented "Surely some weight must be given to opening statements of the complaint and to the physical acts of the party even though statutory formalities were not observed." The theory of the court was that there was nothing to show that there was a design by either the judge or Anderson to leave Anderson "unsworn." Thus, silence did not outweigh the wording of the certificate and the actual signing in view of the fact that there was nothing from which it could be concluded that the party intended not to be sworn.

In State v. Kemp, 137 Kan 290, 20 P2d 499 (1933), the Kansas Supreme Court upheld a perjury conviction. The defendant argued that there was no proof that he took an oath. The court pointed out that this was a question of fact. The defendant had verified an affidavit used in a lawsuit in which he denied the execution of a note and denied that he signed the note involved. He had gone to the notary for the verification. The notary testified that the defendant signed

in his presence and all he did was ask the defendant if that was "his free act and deed," and, when the defendant replied in the affirmative, he put his seal on it. The affidavit had a certificate that used the words "————— being first duly sworn upon his oath states. . . ." The court concluded that in the absence of clear proof that the ceremony or lack thereof was designed by the participants to leave Kemp unsworn, the legal effect was the same as if Kemp had been sworn according to the formalities prescribed for the administration of oaths.

The court in the Kemp case relied on a 1927 Miss Supreme Court case, Atwood v. State, 110 So 865 which appears annotated in 51 ALR 836. The Atwood case is followed and cited in many cases. There the defendant was convicted of possessing intoxicating liquors. The question arose as to whether or not the affidavit for the warrant which was required under the Constitution, was valid. The affidavit for the search warrant was signed in the presence of a justice of the peace for the purpose of obtaining such warrant. The justice did not require affiant to hold up his hand to be sworn nor was there any formal oral administration of the oath. In testifying the justice of the peace stated it wasn't customary for him to require persons to hold up their hands. He further said that the signing by affiant and his affixing of the jurat was "just like acknowledging a land deed." The court pointed out however that both the justice of the peace and the affiant knew and realized that an oath was necessary before a warrant could issue and that they considered what was done at the time the oath was signed to be sufficient to constitute an oath; that both understood *without anything being said* that the affiant was making the necessary affidavit to obtain the search warrant. The court said "One may speak as plainly and effectually by his acts and conduct as

he can by word of mouth." The silence surrounding the execution of the oath did not destroy the validity of it.

In State v. Madigan, 57 Minn 425, 59 NW 490 (1894), the notary public testified that the defendant signed an affidavit, and then he signed it and put his seal on. He asked the affiant if that was his signature and the affiant said, "Yes." The affiant had previously signed the affidavit before bringing it to the notary. The affiant stated that he had signed in good faith as he would not want to "commit perjury." The court held that the acts constituted sufficient swearing to support a perjury charge.

In United States v. Mallard, 40 Fed 151, the defendant was charged with perjury. The Commissioner before whom the complaint was made and who reduced it to writing read it aloud and then stated "If you swear to this statement, put your mark here." The statement had in it "Personally appeared —— who, being sworn, deposes. . . ." The court held this was sufficient swearing, stating that the general principle was that whenever the attention of the person is called to the fact that the statement is not a mere asservation but must be sworn to, and in recognition of this, he is asked to do some corporal act and does it, the statement is then under oath.

In McCain v. Bonner, 122 Ga 842, 51 SE 36 (1905) the attorney, who signed an affidavit for a distress warrant, stated that he signed it and carried it to the magistrate, read it over to him and told him that he wanted to make an oath to it. The magistrate testified he didn't know the character of the paper, that he administered no oath nor did the attorney undertake to swear to the truth of the statement of fact. The court held that whether or not an oath was taken was a jury question and though the jury held that there was no proper oath in this case, nevertheless, it

could have held the other way. It is to be noted that the notary himself did not give evidence that he was administering an oath even though the court made reference to the oft repeated rule that it is sufficient if both the affiant and the officer understand that what is done is all that is necessary to complete the act of swearing.

In Dalby Bros. Lumber Co. v. Crispin, 12 NW2d 277 (Iowa Supreme Court, 1943) there was an action to foreclose a mechanic's lien. It was claimed that one lien was erroneous as there was no verified statement filed. The notary certificate used was in the form of an acknowledgment. However, the first page started "I, ———, on oath depose and say . . . and the statements and allegations therein made are true . . ." The notary signed ". . . and acknowledged that he executed the same as his voluntary act . . ." The court pointed out that Dalby, *as shown by the certificate itself,* was conscious of the fact that he was swearing. The court said the purpose of an oath was to secure the truth and any form which is ordinarily calculated to appeal to the conscience and by which the affiant signifies that his conscience is bound is sufficient, citing Atwood v. State, supra.

In DuBose v. Kelly, 181 So 11 (Florida Supreme Court, 1938) the notary public testified that each signer "made oath" before him but he stated that the affidavit was not read by him and that he presumed the signers had read it. The proceedings were recall petitions and it was pointed out that if the affidavits weren't valid, the proceedings were void. The trial court refused to issue a restraining order against calling the election for the recall and the Supreme Court refused to reverse it on the grounds that the holding of the trial court was not clearly erroneous. Thus, in effect, the Supreme Court approved the trial court's apparent finding that the affiants were sworn in.

In State v. Holladay, 120 SC 154, 112 SE 827 (1922) it was claimed that the search warrant was illegal as a magistrate did not "swear" the affiant. The affiant had said "I want to make this affidavit before you" and then signed it. In answer to the question as to whether or not he gave an oath, the magistrate said, "No." Nevertheless, the court held that affiant was under oath.

In Cincinnati Finance Co. v. First Discount Corporation, 59 Ohio App 131, 17 NE2d 383 (1938) it was claimed that certain mortgages weren't sworn to. The notary testified that the mortgages were presented to her, that they were signed in her presence and that she signed the jurat in the presence of the agent. The agent did not raise his hand, and no oral oath was administered. The court said, "In other words no word or act passed between them at the time other than the signing of their names on the appropriate places." The language of the statement signed was as follows: "Subscribed and sworn to before me. . . ." This language, the court said, was controlling, and, where a person for the purpose of taking an oath knowingly signs *a written statement of an oath* before an officer authorized to administer the oath, the law is complied with as effectively as when he responds to an oral oath. See also Dunlap v. Clay, 65 Miss 454, 4 So 118 (1888).

In contrast to the above cases are those cases which rely on the 1881 case of O'Reilly v. People, 86 NY 154, 40 Am Rep 525. In that case the affiant signed an affidavit which recited that he had been duly sworn before a notary who certified to it without any questions or formalities. The court pointed out that the affidavit by reading "being duly sworn" and in reading "I do hereby swear" showed that it did not constitute the act or obligation of the oath itself. The court stated that there must be an unequivocal and

present act by which the affiant consciously takes upon himself the obligation of an oath and held that the mere delivery of a signed affidavit was not such an act.

Citing the O'Reilly case is the case of Milmore v. Meyer, 15 NYS2d 899 (1939) wherein a county court refused to accept an affirmative answer as an oath when the witness was asked "Do you swear the sum due defendant is true. . . . ?" The court referred to an Attorney General opinion that the minimum requirement for swearing an affidavit would be "You do solemnly swear that the contents of the affidavit subscribed by you is correct and true."

In State v. Privitt, 39 SW2d 755 (Mo Supreme Court, 1931) the prosecuting attorney signed a petition and then sent it by messenger to a justice who in reliance thereon issued a search warrant. Quoting O'Reilly, supra, the court held that an oath was not taken as he did not present the petition to the justice. In other words, mere delivery of a signed affidavit by messenger would not be sufficient.

In Sprangler v. District Court of Salt Lake County, 140 P2d 755 (Utah Supreme Court, 1943), the complaining witness merely signed the complaint in the presence of the justice of the peace. The complaint said "on being duly sworn by me, on his oath did say." The court noted that there was a division of authority whether such an act constituted an oath. The court cited O'Reilly, supra, and then pointed out that it was aware of the line of cases which have relaxed the requirements for taking the oath, such as Cincinnati Finance Co., supra. The court refused to recognize that what was done in the case amounted to an oath and held that merely appearing before a justice of the peace and signing a criminal complaint did not constitute swearing to it.

█ In the instant case we prefer to apply the general rule followed in and underlying the majority

of the cases above noted. A rule which does not hue to the hard strict wording of an old statute, but which still preserves a requirement which includes a conscious calling upon an individual to subscribe to the truth seems much more realistic and fair. The evidence here showed that in every case the affiant approached the notary and asked the notary to take some official action in regard to the affidavits. The usual word used was "notarized," which to the layman is the only function a notary public performs. It also showed that in every case the notary asked the layman to sign the affidavit and in some cases the notary asked the affiant to affirm the truth of the matters stated in the affidavit, and in every case the affiant would sign the affidavit in the presence of the notary, and, when asked, would affirm the truth of its contents. This evidence, in our judgment, constitutes a sufficient basis upon which to support the finding made that a sufficient oath was administered.

■ It is next objected that the affidavits of those circulating the petition were false, and hence, the signatures thereupon should not be counted. It is pointed out that the circulators Swofford and Sparks testified that they were not personally acquainted with some of the signers and it is argued that if the circulators did not know or were not acquainted with some of those who signed their petitions they could not know if the signatures were genuine, where the persons lived and whether or not they were qualified to vote. This argument is insufficient to invalidate these petitions, because the oath of the circulator does not require that the signer must be personally known, but only that to the best of the knowledge and belief of the circulators, the persons so signing were, at the time of signing, electors entitled to vote. Moreover, from an examination of the abstracted testimony of the circulators we feel that the lower court could reasonably and fairly conclude that the circulators

sufficiently inquired into the ability of the signers to sign to justify their signatures being counted. We further point out that the placing of the address opposite the name gave sufficient information to the objectors to verify the facts, and that nowhere in the record was there any evidence introduced by the objectors which would indicate that the signatures counted by the lower court were not genuine.

█ We now turn to the last objections and show, by the following table, the number of signatures claimed invalid and the classification of the same:

| | Rice Petition | Melvin Petition |
|---|---|---|
| (a) Signature by mark. | 26 | 25 |
| (b) Name, address and date signed by one other than person whose name appears, but in the presence and at direction of signer. | 14 | 14 |
| (c) Name written by signer but address and date written by another in presence and at direction of signer. | 132 | 132 |

The applicable statute (Section 19–58(c)) of the Cities and Villages Act; now Section 4–7–3 is as follows:

"The petition shall consist of sheets having the form specified in subdivision (b) of this section, except the affidavit, printed or written at the top thereof and shall be signed by electors in their own handwriting. Opposite his signature, each petitioner shall write the street and number of his residence (if there are such) and the date on which he signs the sheets. No signature shall be valid unless the requirements in this subdivision

92

are complied with and unless the date of signing is less than four months preceding the date of filing the petition.

"At the bottom of each sheet shall be added the affidavit in the form specified in subdivision (b) of this section, signed by a resident of the municipality in which the signers of the sheet reside. This affidavit shall be sworn to before an officer, residing in the county in which the municipality is located, who is qualified to administer oaths therein.

"The petition, so verified, or a copy thereof duly certified by the proper persons, shall be prima facie evidence that the signatures, statement of residence, and dates upon the petition are genuine and true, that the persons signing the petition are electors qualified to vote for a successor of such incumbent, and, in municipalities in which electors are required to be registered, that they were duly registered at the time they signed the petition."

The Commissioners claim that this statute unambiguously requires the addresses and dates of all signers to be written *by the hand* of the signer, and that no signature can count if this is not done. They quote familiar law to the effect that a clear and unambiguous statute needs no construction; and that where its terms are peremptory and exclusive and no discretion is reposed, or where, as here, penalties are provided for its violation the provisions are mandatory and not directory. The Commissioners say that they do not urge a strong or tortured construction but simply ask that the words used by the legislature be given their plain, ordinary meaning. They add that a strict counting of the necessary 55% needed for this petition is required because the legislature, in requiring such a large number of petitioners, "wisely kept the recall

process out of the hands of ignorant people who would not understand what they were doing, or who were too lazy or indifferent to write their names, residences and dates of signing."

There has been no decision by the Illinois courts on this question. We do, however, find that sister states have, on occasion, looked at the problem. It has been held that recall statutes should be liberally construed to effectuate the purpose for which they were intended. In re Initiative Petition No. 23, 127 P 862 (Okla 1912); Ley v. Dominguez, 299 P 713 (Cal 1931). Further, it has been held that a substantial compliance with statutory provisions is all that is necessary for a petition's sufficiency. State v. Myers, 127 Ohio St 95, 186 NE 872 (1933); State v. Bratsberg, 210 NW 4 (ND 1926); State v. Addison, 132 Ohio St 477, 9 NE2d 148 (1937); Conn v. City Council of Richmond, 121 P 714 (Cal App 1912); 43 CJ 671.

In State v. Myers, 127 Ohio St 95, 186 NE 872, 873, the Court construed a requirement of the Ohio Constitution which required "each signer of any initiative supplementary or referendum petition . . . (to) place on such petition after his name the date of signing and his place of residence" in the following manner:

> "We hold that it is not necessary for an elector himself to write out the date, his place of residence, the township and county, the municipality, the street number, or the ward or precinct. He is required to sign his own name, and, if the other information called for is properly filled in by someone else, at the direction and with the authority of the elector signing the petition, the Constitution has been complied with. This ruling requires that the demurrer filed to the petition in mandamus be sustained."

In Chester v. Hall, 204 P 237, the statute provided that the signer of a petition should "affix thereto" the

94

date of signing, and the court held that a third person could place the date upon the petition in the presence and at the direction of the signer.

Only in South Dakota do the decisions require that the address and date be placed upon the petition by the signer personally. This harshness may be due to the fact that only 8% are needed to recall in that state. At any rate, South Dakota appears to stand alone. See: State v. Wells, 281 NW 357 (SD 1938); Morford v. Pyle, 220 NW 907 (SD 1928).

We have carefully studied the above quoted statute and read the older statute from which the present one emanated. We do not agree that this statute is plain and unambiguous and, without further ado, requires the interpretation the Commissioners demand. For instance, we note: (1) Although the statute provides that the petition "shall be signed by electors *in their own handwriting*" (italics ours), it merely requires that "Opposite his signatures, each petitioner shall write. . . ." Surely, if the legislature meant to be as insistent about a signer's personally writing his address and date, as they were about the signature, they would have included the words "in their own handwriting." Omitting these words can only mean that the legislature meant to be less restrictive. (2) The statutory form of certificate to be executed by the circulator provides as follows: "that the signatures on this sheet were signed in my presence . . . that their respective residences are correctly stated as above set forth." This is an even clearer indication to us that the legislature never intended that the address and dates had to be written by the signers. Nothing could be much plainer. (3) The former statute (Chapter 24, Section 307(c) Ill Rev Stats 1939) required that "opposite the signature of each petitioner shall be written by such person the street. . . ." The amendment of this former statute to the present form, in 1941, states "shall write" but omits "by such

95

person." To us, this is a clear indication that the legislature intended to clarify the statute so as not to make it mandatory that the signer himself must write his address and date. (4) Section 19-6 of the former statute (now Section 4-2-3) is the section which provides for a petition to adopt the commission form of city government. It is similar to Section 19-58. The Commission Notes (Chap 24, sec 19-6, Smith-Hurd Annotated Statutes) state that "it was intended to require petitioners to sign in their own handwriting." No mention is made of the address and date.

We therefore conclude that the meaning and intention of our statute does not extend to the requirement that a signer must also, in person, sign his address and the date, and that the lower court properly counted those signatures wherein the address and the date were written by another person in the presence and at the direction of the person who signed his name.

By directing that these signatures be counted, we obviously need not decide the remaining questions, for a decision either way would not alter the outcome.

The order of the trial court was correct and it is affirmed.

Affirmed.

SCHEINEMAN and CULBERTSON, JJ., concur.