STATE *ex rel.* THE CITY OF CHARLESTON, *etc., et al.*

*v.*

JOHN G. HUTCHINSON, *Treasurer, etc.*

(No. 12994)

Submitted September 2, 1970.   Decided September 29, 1970.

Petition for Rehearing October 28, 1970.

Rehearing Denied November 16, 1970.

*B. Duffy Horan,* City Solicitor, *Cleo S. Jones,* for relators.

*Mario J. Palumbo, George A. Daugherty,* for respondent.

BERRY, JUDGE:

This is an original proceeding in mandamus instituted under the original jurisdiction of this Court in which the City of Charleston, a municipal corporation, and Elmer H. Dodson, its Mayor, petitioners herein, seek to compel John G. Hutchinson, Treasurer of the City of Charleston, to transfer the token sum of $10,000 from the Parking System Revenue Fund to the general fund of the City of Charleston, from which it could be used for municipal purposes other than those connected with the operation of the parking system. The total amount involved

is actually $100,000 which the petitioners desire to have transferred from the Parking System Revenue Fund to the general fund of the City.

The petition was filed on July 21, 1970 and a rule was issued returnable September 2, 1970 at the Regular September Term of this Court, at which time it was submitted for decision on arguments and briefs.

The controversy in this case arose over the attempt by the petitioners to withdraw a surplus accumulated in the Parking System Revenue Fund above the money needed for the current operation and current sinking fund requirements of the bonds with which the parking facilities were originally constructed. The details of the system were originally set up by a City ordinance.

Prior to 1965 it appears that most of the parking facilities were ordinary parking meters in most instances located on streets and commonly called "on-street" parking facilities. About that time it was decided to add to the parking facilities several tracts of land at different places in the City, most of which were in the vicinity of the City Hall, in which metered "off-street" parking could be accommodated. In order to finance these "off-street" parking facilities, Ordinance No. 794 was adopted by the City on September 7, 1965; and Ordinance No. 843 was adopted on May 19, 1966. The second Ordinance was for extension or addition to the system created by the first Ordinance. The method of financing the construction was by the issuance of revenue bonds which depend for their payment upon the revenue to be derived from the parking system, thereby avoiding the pledging of the general credit of the City, which would have required the submission of a bond issue question to the vote of the citizens of the City.

The method authorizing the issuance of Parking Revenue Bonds in 1965 and 1966 was contained in Article 4A of Chapter 8 of the Code of West Virginia, which has since been amended but is still similar. The statutes applicable to this case are now in Articles 13 and 16 of Chapter 8 of the Code of West Virginia, as amended.

Under the first Ordinance, referred to above, $420,000 worth of bonds were issued, and under the second Ordinance $295,000 more were issued under almost identical conditions as set up by the first Ordinance. By these Ordinances the entire "on-street" and "off-street" parking facilities of the City were combined into one unit known as the Parking System. Money derived from the sale of the bonds was to be deposited in a completely separate special fund called "Construction Trust Fund," which as its name implies could be used only for acquisition of facilities and construction thereof, and the gross revenues of the system were to be deposited in a special fund called "Parking System Revenue Fund." It is with the Parking System Revenue Fund that we are concerned in this proceeding since it is the only one of the two funds that can accumulate a surplus if the income is greater than all payments required at any given time to be made under the law. The Construction Trust Fund was at its inception confined largely to the expenditures of the construction, except for small amounts deposited from the Fund into the State Sinking Fund to pay interest on the bonds until the system could produce revenues sufficient to take over this obligation and any left-over amounts were by the Ordinances to be deposited in the Sinking Fund reserve account.

The first Ordinance adopted by the City set up a priority system of distribution of money coming into the Revenue Fund which would be money paid in by the users of the parking facilities. This system may be summarized as follows, using the outline letters of the Ordinance for easy comparison:

A. Payment of operating expenses of the Parking System with an additional amount to be placed in a reserve "Operation and Maintenance Fund" for use in the ensuing fiscal year.

B. Payment to the State Sinking Fund of monthly amounts, which will accumulate into the total semi-annual interest payments and accumulate into the total of the next yearly payment due on the principal of the bonds which come due from 1967 to 1995, and also payment into the Sinking Fund of certain amounts necessary to cover the fiscal charges for handling the bond payments.

C. Payment into the Sinking Fund of a monthly amount to accumulate into a "Reserve Account" eventually covering the principal and interest that will be due in any two ensuing fiscal years.

D. Payments into a "Renewal and Replacement Fund," which shall be used for extensions, improvements and replacements of capital assets which payments are to be deposited in a bank with no future payments necessary after the fund reaches $20,000.

E. If the revenues are insufficient to meet the above payments the deficiency is to be made up with subsequent payments.

The F. Clause provides that: "* * * the balance of any moneys remaining in the Revenue Fund, after all payments provided for above have been made, may be used by the City for the purpose of paying the cost of additions, extensions or improvements to, or the replacement of capital assets of the Parking System, or for the redemption or purchase of the last maturing Bonds then outstanding at prices not exceeding the then redemption price of such Bonds, *or may be withdrawn by the City and used for any lawful purpose; * * *.*" (Emphasis supplied.) This Clause is not to be effective unless all of the A to D obligations have been satisfied.

The G and H Clauses provide that all of the Funds mentioned therein shall be trust funds and used for no other purpose and provide for the investment of the extra funds. Clause F of the distribution system set up by the City Ordinance is the part of the Ordinance that we are concerned with in this proceeding.

In the summer of 1970 the City authorities discovered that the Parking System Revenue Fund contained about $140,000 of which about $30,000 was required to be paid into the Reserve Account, and about $10,000 into the Renewal and Replacement Fund. This left $100,000 for which there was no immediate use. It was decided by the city authorities that this money could be used for current expenses of the City and could be transferred to its general fund. On June 15, 1970 the

City Council passed a resolution directing the Treasurer, the respondent herein, to dispose of the surplus funds by transferring the $100,000 into the City's general fund. The respondent was presented with a check for this purpose and he refused to sign the check and make the transfer to the general fund. The respondent in his answer filed herein stated that the reason for his refusal to make the transfer was that he had been advised, and had concluded, that he would be breaching his fiduciary duty if he mingled the Parking System Revenue Fund with the general fund of the City; that he had been told in December, 1968, by an Auditor for the State Tax Commissioner that it was improper to mix these trust funds with other funds and that they should be segregated. The petitioners contend that the transfer of the funds had been approved by the State Tax Commissioner because he approved the prior levy estimate sheet which included $230,000 of "Parking" receipts with indicated disbursements anticipated therefrom, and that it was a mere matter of mechanics to transfer the surplus of the Parking System Revenue Fund to the general fund. They rely on Clause F in the Ordinance with regard to the method of distribution of the Parking System Revenue Fund, and contend that such surplus of the Fund could be withdrawn for any lawful purpose after all other obligations are satisfied.

The respondent in his answer asserts that the Parking System Revenue Fund should not have been placed in the levy estimate forms of the State, commonly called the "Budget," in the first place; that the State Tax Commissioner would have no way of knowing whether it belonged there, because he had no knowledge of the obligations relating to the bonds and the contracts entered into, and even if he did approve the transfer of the Fund, he was approving an illegal act. To support this position he stated that he had received a letter from the State Tax Commissioner in which the Tax Commissioner stated that he was of the opinion that the Parking System Revenue Fund belonged in the levy estimate which he had approved, but that he did not know what contractual obligation might exist in connection therewith, and that this placed him in the same position as he was in originally relative to the transfer of the Fund with his query unanswered. The

Mayor and the Treasurer then entered into an agreement with regard to the controversy by which the respondent agreed to transfer $90,000 of the Parking System Revenue Fund into the general fund leaving $10,000 which was to be used for the purpose of testing the right to transfer by bringing this mandamus proceeding. It was further agreed that if the Court decided that the Parking System Revenue Fund could not be transferred to the general fund the $90,000 would be refunded to the Parking System Revenue Fund.

It is the contention of the petitioners that the Treasurer has no discretion in refusing the transfer of the Fund in question when presented with an order drawn by the auditor of the City and countersigned by the Mayor and authorized by a council resolution, and that he is performing only a ministerial duty controlled by mandamus. The Ordinances with regard to the issuance of the bonds in question provide that they might be redeemed ahead of time by the payment of a premium which is within the limitation relative thereto as contained in the pertinent statute. This, of course, was to be done with surplus funds built up out of the Parking System Revenue Fund and could not be commenced until 1975.

The only question involved in this proceeding is whether or not the transfer of surplus funds in the Parking System Revenue Fund can be made to the general fund of the City.

The Ordinance heretofore quoted specifically makes the special funds in question trust funds for the payment of the construction, maintenance and repairs of the parking facilities and for the payment of the principal and interest for the bonds issued for the system. The statute specifically makes the Treasurer the custodian of the funds and provides that all such funds must be kept by him separate and apart from all other funds of the municipality. Code, 8-16-20, as amended.

The City Treasurer is elected by the people and is an important officer. The duties of such office are prescribed by law and ordinances of the City. Such officer is held to a higher standard of liability for public trust funds in his custody than ordinary fiduciaries. 13 M.J., *Municipal Corporations*, § 77.

The respondent in this case is not only the City Treasurer but is a trustee of special funds by virtue of the provisions of the Ordinances and statutes providing therefor, and payment from funds in his custody must be made and distributed to the other funds and persons entitled thereto, and he is personally responsible for payments made to others not entitled to such funds. 90 C.J.S., *Trusts,* § 344.

It is the contention of the petitioners that Clause F in the Ordinance setting up the system of distribution of money from the Parking System Revenue Fund authorizes the legal transfer of surplus funds from the Parking System Revenue Fund to the general revenue fund of the City of Charleston. The system of distribution provided for in the Ordinance set out above follows closely the authority providing for such distribution contained in the statute. Code, 8-16-17, as amended. It was also contained in similar words in Code, 8-4A-16, as amended, at the time the revenue bonds were issued and the authority for such distribution in the old statute ends with the following: "After the payments into the sinking fund as herein required, the board may at any time in its discretion, transfer all or any part of the balance of the net revenues, after reserving an amount deemed by the board sufficient for operation, repair and maintenance for an ensuing period of not less than twelve months and for depreciation, into the sinking fund, or into a fund for extensions, betterments and additions to the works." ("Works" includes a parking system.) It will be noted that the City Ordinance contains the additional provision, not contained in the statute, which reads as follows: "* * * or may be withdrawn by the City and used for any lawful purpose." In the interpretation of the meaning of the statutory provisions the maximum, *expressio unius est exclusio alterius,* meaning the express mention of one thing implies the exclusion of another, is applicable. *Layne v. Hayes,* 141 W.Va. 289, 90 S.E.2d 270; *State ex rel. Baker v. Bailey,* 152 W.Va. 400, 163 S.E.2d 873.

It is clear that the City has no express authority by the statute to make any withdrawals from the Parking System Revenue Fund "to be used for any lawful purpose" other than the purposes as provided in the Ordinance set out in the

statute. A city has only the powers granted to it by the legislature, and it must be expressly granted or necessarily or fairly implied or essential and indispensable. If any reasonable doubt exists as to whether a municipal corporation has a power, the power must be denied. *Maxey v. City of Bluefield,* 151 W.Va. 302, 151 S.E.2d 689; *Chesapeake and Potomac Telephone Company of West Virginia v. City of Morgantown,* 144 W.Va. 149, 107 S.E.2d 489; *Delardas v. Morgantown Water Comm.,* 148 W.Va. 776, 137 S.E.2d 426. This principle is succinctly stated in point 2 of the syllabus of the case of *State ex rel. Constanzo v. Hon. Alan H. Robinson, Judge,* 87 W.Va. 374, 104 S.E. 473, wherein the following language appears: "When the general law of the state has so dealt compresensively with the subject matter of a municipal ordinance, the general law is dominant and controlling and the ordinance is invalid and unenforceable, in the absence of specific authority conferred by the legislature."

It was held in the case of *State ex rel. Bibb v. Chambers,* 138 W.Va. 701, 77 S.E.2d 297, that a parking system such as is involved in the instant case is justified under the police power to control traffic on public streets of a municipality but the rates could not be placed so high as to produce more than is necessary for the acquisition and maintenance of the system, and that a city can not use such parking system for the purpose of the imposition of a tax unless it is authorized by the Legislature. The eighth point of the syllabus of the *Bibb* case contains the following language: "Though on-street parking meters were designed to aid in the control and regulation of traffic on the public streets of municipalities, and may be erected and maintained in the valid exercise of the police power, under Section 32, Article VIII, Chapter 40, Acts of the Legislature, First Extraordinary Session, 1933, and fees may be charged for using the parking meters to defray the expense of the regulatory service, a municipality may not devote the use of the meters to purely revenue-raising purposes."

The only authority for the transfer of any funds from the Parking System Revenue Fund involved in this case to the general fund is after all of the bonds and indebtedness have been fully paid off and discharged. Code, 8-13-20, as amended.

The same provision was contained in Code, 8-4A-16a, as amended, at the time the revenue bonds for the Parking System were issued by the City of Charleston involved herein. It would therefore appear from the authorities cited herein that the surplus funds in the Parking System Revenue Fund in the custody of the respondent can not be legally transferred to the general fund for the City of Charleston and used for current expenses until all of the outstanding bonds in connection therewith have been fully paid off and discharged.

Therefore, the writ prayed for is refused.

*Writ refused.*