R. W. SPRADLING, *etc., et al.,*

*v.*

JOHN G. HUTCHINSON, *etc., et al.,* POLICE CIVIL SERVICE

COMMISSION

(No. 13685)

Decided March 13, 1979.

*Catsonis & Linkous, Leo Catsonis and Thomas L. Linkous* for appellants.

*Jackson, Kelly, Holt & O'Farrell and W. W. Upton, Bowles, McDavid, Graff & Love and F. T. Fraff, Jr.,* for appellees.

HARSHBARGER, JUSTICE:

Thirteen applicants were selected by the Police Civil Service Commission for the City of Charleston for final appointment to the Charleston Police Department and were to be sworn in November 4, 1974. But on November 1 the Fraternal Order of Police petitioned for an injunction against their induction. A temporary injunction was issued but then, after hearings, permanent injunction was refused by the Kanawha County Circuit Court.

The Fraternal Order of Police appealed, contending as it did in the trial court, that the applicants did not comply with *W.Va. Code,* 8-14-12.[1]

---

[1] *W.Va. Code,* 8-14-12. Form of application; age and residency requirements; exceptions.

The policemen's civil service commission in each Class I and Class II city shall require individuals applying for admission to any competitive examination provided for under the civil service provisions of this article or under the rules and regulations of said commission to file in its office, within a reasonable time prior to the proposed examination, a formal application in which the applicant shall state under oath or affirmation:

(1) His full name, residence and post-office address;

(2) His United States citizenship, age and the place and date of his birth;

(3) His state of health and his physical capacity for the public service;

(4) His business and employments and residences for at least three previous years; and

(5) Such other information as may reasonably be required, touching upon the applicant's qualifications and fitness for the public service.

Blank forms for such applications shall be furnished by the commission, without charge, to all individuals requesting the same. The commission may require, in connection with such application, such certificates of citizens, physicians and others, having pertinent knowledge concerning the applicant, as the good of the service may require.

No application for original appointment shall be received if the individual applying is less than eighteen years of age or more than

Specifically, the FOP alleges that the applications of the thirteen failed to comply with a mandate of *Code*, 8-14-12, that applicants must state under oath or affirmation certain information;[2] two applicants did not meet residency requirements;[3] and one was older than allowed.

We find that the application forms signed by the thirteen meet the statutory requirement of oath or affirmation. The forms contained this language: "I HEREBY CERTIFY THAT THERE ARE NO WILLFUL MISREPRESENTATIONS IN, OR FALSIFICATIONS OF, THE ABOVE STATEMENTS AND ANSWERS TO QUESTIONS." Then followed the signature lines.

---

thirty-five years of age at the date of his application: Provided, that in the event any applicant formerly served upon the paid police department of the city to which he makes application, for a period of more than his probationary period, and resigned from the department at a time when there were no charges of misconduct or other misfeasance pending against such applicant, within a period of two years next preceding the date of his application, and at the time of his application resides within the corporate limits of the city in which the paid police department to which he seeks appointment by reinstatement is located, then such individual shall be eligible for appointment by reinstatement in the discretion of the policemen's civil service commission, even though such applicant shall be over the age of thirty-five years, and such applicant, providing his former term of service so justifies, may be appointed by reinstatement to the paid police department without a competitive examination but such applicant shall undergo a medical examination; and if such individual shall be so appointed by reinstatement to the paid police department, he shall be the lowest in rank in the department next above the probationers of the department.

Any applicant for original appointment must have been a resident for one year, during some period of time prior to the date of his application, of the city in which he seeks to become a member of the paid police department: Provided, that if the commission deems it necessary it may consider for original appointment or for reinstatement under the preceding proviso of this section, applicants who are not residents of the city but who have been residents of the county in which the city or any portion of the territory thereof is located for a period of at least one year.

[2] *See* n. 1.

[3] *See* final paragraph of n. 1.

An oath or affirmation is a subscription to the truth of that to which it is made. *See, In re Rice*, 35 Ill. App.2d 79, 181 N.E.2d 742, (1962); *Greenwald v. State*, 221 Md. 235, 155 A.2d 894 (1960); and *Spangler v. District Court of Salt Lake County*, 104 Utah 584, 140 P.2d 755 (1943).

In *State v. Nuckols*, 152 W. Va. 736, 166 S.E.2d 3 (1968), we said: "The word 'oath' in this state includes both swearing and affirming...." 152 W. Va. at 748, 166 S.E.2d at 11.[4] *The Random House Dictionary* (1973), defines 'certify' as "1. to attest to or vouch for in writing ...." It defines 'affirm'—"1. to state or assert positively; maintain as true ... 2. to confirm or ratify ... 4. to declare solemnly before a court or magistrate, but without oath." We discern no difference between an affirmation of truth, and a certification of truth. They both vouch for truthfulness.

The second issue in this appeal is the constitutionality of the residency requirement of *Code*, 8-14-12.[5] The general rule is that statutes regulating appointments under civil service are mandatory and must be strictly complied with and construed. *Cawley v. Board of Trustees*, 138 W. Va. 571, 76 S.E.2d 683 (1953). In particular, we have held that the police civil service commission "owes its creation and existence to statute. It has no inherent powers... [but] only such powers as are conferred upon it by statute, either expressly or by necessary or fair implication." *State ex rel. City of Huntington v. Lombardo*, 149 W. Va. 671, 681, 143 S.E.2d 535, 542 (1965). *See also: Miller v. City of Morgantown*, W. Va., 208 S.E.2d 780

---

[4] See *Code*, 2-2-7, which states: "A solemn affirmation shall be equivalent to an oath in all cases, unless otherwise expressly provided, and the word 'oath' shall be deemed to include an affirmation and the word 'swear' or 'sworn' to be complied with if the person referred to makes solemn affirmation."

[5] The entire code provision is set forth in n. 1 of this opinion; however, the specific requirement being challenged here is that "Any applicant for original appointment must have been a resident for one year, during some period of time prior to the date of his application, of the city in which he seeks to become a member of the paid police department...."

(1974) and *State ex rel. City of Charleston v. Hutchinson*, 154 W. Va. 585, 176 S.E.2d 691 (1970).

Thus, the Charleston Police Civil Service Commission cannot legally act beyond the powers bestowed upon it by statute [8-14-12] and must strictly abide by the requirements in that law. Since the statute clearly states that an applicant must have been a resident of the city to which he is applying, for at least one year prior to the date of his application, the question is whether the commission acted *ultra vires* by certifying applicants for police officers who did not meet the residency requirement of the statute, or whether the requirement itself is void, as contended by the appellees.

Residence requirements have been discussed in numerous cases since *Shapiro v. Thompson*, 394 U.S. 618 (1969), when the United States Supreme Court recognized the right to travel as a fundamental constitutional right and struck down a state statute requiring one year residency prior to seeking welfare assistance. The Court found that the durational requirement divided welfare applicants into two groups "indistinguishable from each other except that one is composed of residents who have resided a year or more, and the second of residents who have resided less than a year, in the jurisdiction. On the basis of this sole difference the first class is granted and the second class is denied welfare aid upon which may depend the ability of the families to obtain the very means to subsist—food, shelter, and other necessities of life." 394 U.S. at 627. Because the requirement infringed upon the right to travel, a fundamental constitutional right, by denying welfare benefits to those who had exercised it, the Court applied the compelling state interest test, and then held the requirement violated the equal protection clause because there was no such interest. *Id.* at 634.

After *Shapiro*, the Court found that durational residency requirements for eligibility to vote[6] and for hospi-

---

[6] *Dunn v. Blumstein*, 405 U.S. 330 (1972).

tal and medical services[7] unconstitutionally infringe upon an individual's fundamental right to travel.

Then, in *McCarthy v. Philadelphia Civil Service Commission*, 424 U.S. 645 (1976), a Philadelphia municipal regulation requiring that city employees be residents of the city, was upheld. Emphasizing the novelty of the particular question it must decide—the validity of a requirement that a person be a resident *at the time* of his application, the Court said:

> We have previously differentiated between a requirement of continuing residency and a requirement of prior residency of a given duration. Thus in *Shapiro, supra*, at 636, we stated: "The residence requirement and the one-year waiting-period requirement are distinct and independent prerequisites." And in *Memorial Hospital, supra*, at 255, quoting *Dunn, supra*, at 342 n. 13, the Court explained that *Shapiro* and *Dunn* did not question " 'the validity of appropriately defined and uniformly applied bona fide residence requirements.' " 424 U.S. at 647.

Numerous lower federal and state courts have decided residency requirement issues. After the Supreme Court cases, some adopted the fundamental "right to travel" rationale, then applied the strict compelling state interest test to invalidate the requirements,[8] and at least one federal court has applied the same reasoning but found the necessary compelling state interest.[9] However, more

---

[7] *Memorial Hospital v. Maricopa County*, 415 U.S. 250, 94 S.Ct. 1076, 39 L.Ed.2d 306 (1974).

[8] *Donnelly v. City of Manchester*, 111 N.H. 50, 274 A.2d 789 (1971) and *Fraternal Order of Police v. Hunter*, 36 Ohio Misc. 103, 65 Ohio Op.2d 144, 303 N.E.2d 103 (1973).

[9] In *Krzewinski v. Kugler*, 338 F. Supp. 492 (D.N.J. 1972), a three-judge district court upheld a New Jersey tenure statute which required policemen and firemen to be residents of the municipality where they worked. The court found the compelling state interest to be "identity with the community" among police and firemen. Disrespect for an absent police force was seen as contributing to the problem of lawlessness and disengagement between work hours and personal life was considered to detrimentally affect an officer's attitude toward the people in the municipality where he was employed. Two additional considerations supporting the "identity with

often, to uphold statutory residency requirements for firemen and policemen, courts have found that they do not penalize the fundamental right to travel,[10] and hence, need not be justified by a compelling state interest, but merely have a rational basis. *See Andre v. Board of Trustees of Village of Maywood*, 561 F.2d 48 (7th Cir. 1977); *Wright v. City of Jackson, Mississippi*, 506 F.2d 900 (5th Cir. 1975); *Miller v. Krawczyk*, 414 F. Supp. 998 (E.D. Wis. 1976); *Ector v. City of Torrence*, 10 Cal.3d 129, 109 Cal. Rptr. 849, 514 P.2d 433 (1973), *cert. denied*, 415 U.S. 935, 94 S.Ct. 1451, 39 L.Ed.2d 493 (1974); *Detroit Police Officers Association v. City of Detroit*, 385 Mich. 519, 190 N.W.2d 97 (1971), appeal dismissed for lack of a substantial federal question, 405 U.S. 950, 92 S.Ct. 1173, 31 L.Ed.2d 227 (1972); *Hattiesburg Firefighters Local 184 v. City of Hattiesburg*, 263 So.2d 767 (Miss. 1972); *Abrahams v. Civil Service Commission*, 65 N.J. 61, 319 A.2d 483 (1974); *Jackson v. Firemen's and Policemen's Civil Service Commission of Galveston*, Tex. Civ. App., 466 S.W.2d 412 (1971); *Salt Lake City Firefighters Local 1645 v. Salt Lake City*, 22 Utah 2d 115, 449 P.2d 239 (1969).

Among the bases often asserted as justification for municipal residency requirements in the latter group of cases are those quoted from *Ector, supra,* in Justice Pashman's dissenting opinion in Abrahams, supra:

> [P]romotion of ethnic balance in the community; reduction in high unemployment rates of inner-city minority groups; improvement of relations between such groups and city employees; enhancement of the quality of employee performance by greater personal knowledge of the city's conditions and by a feeling of greater personal stake in the city's progress; diminution of absen-

---

the community" interest were found: (1) facilitation of the immediate discharge of duties and (2) the presence of the police force as a deterrent to crime. The court also noted the importance of police and firemen being close to their work in a state where rioting and looting have occurred more than once, and where it might be difficult for the officers to commute to work in inclement weather.

[10] *See Town of Milton v. Civil Service Commission*, 365 Mass. 368, 312 N.E.2d 188 (1974).

teeism and tardiness among municipal person-
nel; ready availability of trained manpower in
emergency situations; and the general economic
benefits flowing from local expenditure of em-
ployees' salaries. [Citation omitted] 319 A.2d at
497.

And there are particular reasons recognized for resi-
dency requirements for police officers:

[R]esidents would be more likely to be immedi-
ately familiar with the community. Knowledge of
the local geography would allow quicker re-
sponse, and knowledge of the people could lead to
a greater interest and more conscientious effort
in the performance of duty ... the likelihood that
members of the community would be better ac-
quainted with its police officers and, hence, more
likely to trust and cooperate with them ... the
importance of having police present in the com-
munity during off-duty hours to facilitate indi-
vidual response to matters requiring police inter-
vention as well as to facilitate emergency
mobilization. *Town of Milton v. Civil Service
Commission*, 365 Mass. 368, 312 N.E.2d 188, 193-
194 (1974).

The durational residency requirement of *Code*, 8-14-12,
would fail by *Shapiro* standards; and gives none of the
benefits of continuing residency the cases have men-
tioned. Under either the compelling state interest or
rational basis test, the requirement must fail.[11]

The statute's weakness is illustrated by its application
in this case. Applicant Fannin's residency in Kanawha
County was only during the first 18 months of his life—
more than the "... year, during some period of time
prior to the date of his application" that *Code*, 8-14-12
prescribes. At age 18 months he certainly was not devel-
oping community knowledge or otherwise gaining ad-
vantageous qualities that would make him a better po-

---

[11] We have found no other state statutes with a residency re-
quirement such as ours, that can be satisfied by residence for one
year *at any time* prior to application.

liceman in Charleston when he was appointed more than two decades later. Yet, by the words of *Code,* 8-14-12 he was eligible for appointment to the exclusion, say, of another who during mature life had lived eleven months in the city or county, engaged in community activities educating him in intimate details of the population and geography of the area, and had resided across the street from police headquarters.

We therefore find the one year residence requirement as stated in the statute, void.

There is no reason to strike the entire statute because of the invalidity of this one requirement. The remainder of the statute is severable and survives.

The final issue is applicant Lee's age. The statute in pertinent part states: "No application for original appointment shall be received if the individual applying is less than eighteen years of age or more than thirty-five years of age at the date of his application...."

As we stated earlier, a civil service statute such as *Code,* 8-14-12 is to be strictly construed. However, a statute that is unambiguous requires no construction at all, and our duty is simply to apply it as written. *Cawley v. Board of Trustees, supra. See also: In re Resseger's Estate,* 152 W. Va. 216, 161 S.E.2d 257 (1968), and *State ex rel. Riffle v. City of Clarksburg,* 152 W. Va. 317, 162 S.E.2d 181 (1968).

We are directed to other code provisions that reveal legislative age-requirement language: (1) for judges, retirement when they "... shall have reached the age of sixty-five years ..." [*Code* 51-9-6]: (2) for municipal employees' retirement "... after attainment of age sixty ..." [*Code* 8-22-7]; and (3) for retirement of policemen and firemen "... upon his attaining the age of fifty years ..." [*Code* 8-22-25]. We recognize these are dates set for eligibility *for* benefits, but find it impossible to make ineligibility for employment depend upon our reading into the statute that an applicant must not have attained his or her thirty-fifth birthday to be eligible,

which is what the FOP would have us do. Its argument suggests that we interpret the statute to say that when an applicant is a day past the thirty-fifth anniversary of his or her birth, the applicant is ineligible.

Ivin Beatrice Lee was born July 22, 1938 and filed her application September 5, 1973. Her thirty-fifth birthday was July 22, 1973. In common understanding she was "thirty-five" until her thirty-sixth birthday. Only then, we believe, would she be more than thirty-five years old.

The Kanawha County Circuit Court is affirmed.

*Affirmed.*

NEELY, JUSTICE, *dissenting:*

I respectfully dissent from the majority's holding in syllabus point 2 as I believe that the requirement that applicants for the position of police officer have been residents of the municipality for one year before their application for employment is eminently reasonable. Oddly enough, the authority cited by the majority supports my conclusion. Police officers must understand the community they serve both geographically and psychologically. *See Town of Milton v. Civil Service Commission,* 365 Mass. 368, 312 N.E.2d 188 (1974). When the radio dispatcher calls all units to inform them of an armed robbery in progress at Krogers in Kanawha City and the patrolman responds with "Where's that at?" it is then too late to educate police officers about the lay-out of the city. It would be unfortunate indeed if a city police officer in West Virginia knew less about his city than the felon he is assigned to apprehend.

I do not cavil for a moment with the proposition that the right to travel is a fundamental constitutional right and that before it can be infringed, a compelling state interest must be served. However, public employment, contrary to popular opinion, is not welfare, *Shapiro v. Thompson,* 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969), nor is it controlled by the same principles as voting, *Dunn v. Blumstein,* 405 U.S. 330, 92 S.Ct. 995, 31

L.Ed.2d 274 (1972), or medical services, *Memorial Hospital v. Maricopa County*, 415 U.S. 250, 94 S.Ct. 1076, 39 L.Ed.2d 306 (1974); a person may have a right to travel and not starve in the process but he does not have a right to work for the City of Charleston. Not only does the residency requirement serve to insure a police force knowledgeable about the community, it also helps preserve the community itself.

Unfortunately, government is one of West Virginia's few growth industries and, because it offers clean, healthy, interesting, and secure work, it is rapidly becoming not just the employer of last resort; it is as well the employer of first resort. Parents are separated from their children, siblings from one another, and lifelong friends from each other because of the need to find work elsewhere in other states; therefore, it does not seem unreasonable to me that government jobs should be for people who live in the area where the government governs because it is their friends and families who pay the taxes. Such a rule, ethnocentric though it may be, has the salutary effect of keeping families together and helping to reduce the penury and hopelessness of the old who want their children among them. It is time that this Court took into consideration the plight of the little man who, among other simple requests, would like to know that he will not die alone, separated from his children so that some out-of-stater who has never suffered for West Virginia can suck what little cream there is from a very small bottle of milk.