137 N.J. Super. 570 (1975)
350 A.2d 83
GOLDIE TRAINOR, GEORGE W. FITZSIMMONS, PATSY GALANTE, LOIS N. KAUDER, ANN RYAN, INDIVIDUALLY, AND AS REPRESENTATIVES OF THE CLASS OF ALL OTHER PERSONS SIMILARLY SITUATED, PLAINTIFFS,
v.
CITY OF NEWARK, DEFENDANT.
Superior Court of New Jersey, Chancery Division.
Decided November 20, 1975.
*574 Mr. Albert G. Besser, for plaintiffs (Messrs. Hannoch, Weisman, Stern & Besser, attorneys).
*575 Mr. Salvatore Perillo, for defendant (Mr. Milton A. Buck. Corporation Counsel of the City of Newark, attorney).
Mr. John Cervase, for intervenor Veterans Civic League of New Jersey.
ANTELL, J.S.C.
In this class action brought on behalf of approximately 476 nonresident employees of the City of Newark plaintiffs ask declaratory and injunctive relief relative to a local ordinance requiring that all officers and employees of the defendant city be bona fide residents therein. The action is grounded in claims of unconstitutionality under the Equal Protection Clause of the 14th Amendment to the United States Constitution and in equitable considerations arising from the city's long-standing policy of indifferent enforcement.
The ordinance is R.O. 2:14-1. It provides:
All officers and employees of the city now in the employ of or hereafter to be employed by the city are hereby required as a condition of their continued employment to have their place of abode in the city and to be bona fide residents therein except as otherwise provided by the charter. A bona fide resident, for the purpose of this section, is a person having a permanent domicile within the city and one which has not been adopted with the intention of again taking up or claiming a previous residence acquired outside of the city limits.
The director of any department or the mayor or city clerk is hereby authorized in his discretion, for good cause shown, to permit any officer or employee of the city in his respective department or office to remain in the employ of the city without complying with the provisions hereof, where:
(a) The health of any officer or employee necessitated residence outside of the city limits;
(b) The nature of the employment is such as to require residence outside of the city limits;
(c) Special circumstances exist justifying residence outside of the city limits.
Failure of any officer or employee to comply with this section shall be cause for his removal or discharge from the city service.
Included among the questions assigned for constitutional treatment is whether the ordinance can be "uniformly applied" *576 where policemen, firemen and other municipal officials are exempted from its application under N.J.S.A. 40A:14-122.1 and 9.1, and N.J.S.A. 40A:9-1. This is the issue specifically reserved for future consideration in Abrahams v. Civil Service Comm'n, 65 N.J. 61, 64, fn. 1 (1974), and particularly the concurring opinion of Clifford, J. at 76. The chief features of the Abrahams case were its holdings that (1) the ordinance did not form an unconstitutional restraint upon the right to travel; (2) the "special circumstances" exception contained in the ordinance was void for want of adequate standards, and (3) plaintiff employee had not sufficiently demonstrated the city's discriminatorily selective enforcement of the ordinance against her.
In urging their right to relief, in addition to the question left open by Abrahams, plaintiffs also rely upon (1) the city's refusal to apply the ordinance to employees of its municipal agencies; (2) its refusal to apply it to the officials mentioned in N.J.S.A. 40A:9-1; (3) its widespread use of independent contractors whose employees are not subject to the residency requirement, and (4) its long and continuing history of hiring and retaining nonresident employees in violation of its own ordinance.
Although some variation in the pertinent statistics will be found, depending upon the sources and interpretation of information utilized, for practical purposes they are correct, subject only to minor adjustments.
Excluding employees of the autonomous agencies such as the Parking and Housing Authorities, Library, Museum and Board of Education, the City of Newark is served by 10,677 employees, of whom 1,884 are nonresidents. Of the latter number 1,408, or 75%, are exempted from the residency requirement by reason of the police and firemen's statutory exemption and under the city's interpretation of N.J.S.A. 40A:9-1. Out of a total complement of 1935 police department employees 673, of whom 99% are exempt, are nonresident. Out of 1,125 fire department employees 703, of whom 99% are exempt, are also nonresidents. Out of a *577 total of 27 Law Department employees 13 are nonresidents, and of these 92% are exempt under the city's reading of N.J.S.A. 40A:9-1.
At the other end of the scale, in the Recreation Department, out of 248 employees 14 are nonresidents, none of whom is exempt from the residency requirement. The same proportion is true of the departments administered under the grant programs, in which 4,844 persons are employed. The Health and Welfare Department has 479 employees, 115 of whom are nonresidents, and less than 1% of these are exempt.
Of the total nonresident employees, including those hired by the present and past administrations, 355 personnel files were studied. There were evidently an additional 106 in existence, but at the time of the examination they were "unavailable." Of those studied 209, approximately 59%, contained unmistakable written evidence of the employee's nonresidence either at the time of hiring or as the result of a change of address after hiring. Although the remaining files showed no such evidence, it should be remembered that the fact of missing documents was recurrently encountered during the case.
The total number of exempt police and fire personnel number 2,683, representing approximately 25% of all city employees. Against the following numbers of employees of the specified agencies the city also withholds enforcement measures:

 Board of Education ............................ 10,587
 Housing Authority ............................. 1,210
 Parking Authority ............................. 19
 Library ....................................... 377
 Museum ........................................ 107

That the present and past city administrations have at all times been fully aware that the ordinance was being regularly violated has been established with certainty. Since taking office in 1970, 67% of the 64 nonresident appointments *578 which the present administration alone has made involved nonexempt appointees who were nonresident at the time of appointment. This was shown by Civil Service forms and other papers placed in the file at the time of hiring. 11% later became nonresidents. This, too, was shown by papers in their files. Although the remaining 22% of these files contain no written evidence of nonresidency, we must again advert to the fact that it was not unusual for papers to be missing.
The fact of long-standing "official knowledge," Kennedy v. Newark, 29 N.J. 178, 192 (1959), appears in the almost tangible conviction which the evidence commands that "everyone" knew the ordinance was being disregarded. It was shown in oral and written disclosures by job applicants when hired and in discussions with department heads and other superiors relating to changes of residence in which the department head not only approved the moves but reassured the employees that they themselves resided outside the city. It is found in the numerous personnel papers filed at the time of hiring, change of address cards, correspondence with Civil Service authorities, and correspondence with the employees and third parties, all of which showed nonresident addresses for the employees. It is manifest in the correspondence, following the Abrahams case, exchanged by the city and the Civil Service Commission between 1971 and 1974, in which the nonresidency of the employees was called to the city's attention and the city asked to explain its "policy [characterized as "selective enforcement"] of dismissing permanent employees for Non-Residency and hiring provisional Non-Residents" or to explain under which of the ordinance's then viable exceptions the nonresident hirings were being made  a correspondence, it should be noted, which ended with the city flatly rejecting Civil Service's authority even to question the nonresident hirings and with Civil Service abdicating all responsibility to the city for enforcing its ordinance.
*579 Throughout every level of its administration the city has always known that its employees were living outside the municipal boundaries. Although the full extent of the delinquencies might not have been fully appreciated, the information was there to be seen and collated if someone had chosen to look. The fact of "official knowledge" is so free of doubt that it is scarcely denied by the city, and to disbelieve its existence would require a conscious effort of will.
Enacted April 27, 1932 it appears that in the 43 years of the existence of the ordinance there has been only a single job termination for violation of its terms. This occurred in connection with a secretary in the Law Department, and the facts surrounding her dismissal are detailed in Abrahams v. Civil Service Comm'n, supra 65 N.J. at 63.
In 1955 the then mayor announced a grace period within which nonresident employees were required to move back into the city, and it was during this interval that a number of employees brought an action to test the validity of the ordinance. The ordinance was ultimately sustained by the Supreme Court in February 1959, Kennedy v. Newark, supra, clearing the way for enforcement. On March 9, 1959 the mayor gave notice of a further grace period until January 1, 1960, and thereafter notices were sent to 170 employees that their nonresident status violated the ordinance. Of these, between 25 and 40 were sent in error. Of the remainder some took up residence in the city between July 1960 and July 1961; some died, resigned or retired. Of those whose cases proceeded to final disciplinary hearings, 16 received notices finding them guilty of violating the ordinance. To these, however, nothing happened; none were separated from their jobs and nothing further was done to compel their compliance with the requirement. Thus, the enforcement effort ground to a halt. There matters rested until the Abrahams case in 1971 and the present mayor's notice of December 12, 1974 calling upon the employees to conform with the ordinance by May 31, 1975.
*580 Upon taking office the present mayor was aware that "many" city employees were nonresidents, recognizing that certain things had been "tolerated" by previous administrations. He feels that all employees should reside within the city they serve and he actively opposed passage of the exemption for police and firemen in 1972. He knows of no reason why all city job categories cannot be filled by Newark residents and believes that this course should be followed. But despite the Supreme Court's invalidation for vagueness of the "special circumstances" exception in Abrahams, he testified he intends to make "intelligent allowances for the unusual cases." By this he has in mind "where there is an absolute duty to provide a service and impossibility of getting someone from Newark." He feels that the right to do so derived from his obligation to provide for the health, safety and welfare of the citizens of the city.
As noted, the present administration has already hired some 64 nonresidents and, in fact, has hired eight since the date of the Abrahams decision, May 8, 1974. It is the mayor's intention that the making of "intelligent allowances" be reserved as his exclusive prerogative, but he acknowledged that many such appointments were made by others in his administration. The practice followed in connection with the hiring of a nonresident requires that the appointee execute an affidavit in which he acknowledges the residency requirement and expresses an intention to take up residency after being hired. However, there is no provision for follow-ups to determine whether the commitment is being kept, and the administration is aware of no legal authority sanctioning the hiring of nonresidents on the basis of such affidavits. The mayor feels that his general powers provide the necessary authority.
No particular effort has been made by the city to recruit Newark residents for job vacancies, nor has residence been specified either as a condition or attribute of job eligibility in recruitment letters sent by the city to local colleges and law schools.
*581 It is the administration's view that N.J.S.A. 40A:9-1 mandates the exclusion of the officers therein enumerated from the reach of the residency ordinance, and it has made no attempt to secure a court determination in connection therewith. Those officials are therefore permitted to reside outside the city. The administration does not regard the approximately 1,700 employees of the Housing and Parking Authorities, the Library and Museum as "employees of the city" subject to the residency ordinance, and no effort is made to enforce the requirement as to them either. Nor have efforts been made to induce these agencies, when their governing bodies are nominated or thereafter, to impose comparable requirements on these employees.
Although their precise nature is unknown, certain services are provided by the city through the use of independent contractors. There are more than 500 such contracts now in effect and no effort has ever been made by the city to negotiate residency requirements for the employees of such contractors into the contracts or to require that the contractors hire a minimum number of Newark residents.
Within the administration personnel policies have not yet fully resolved the definition of a "resident" under the ordinance. The present Director of Recreation and Parks, for example, was residing in Philadelphia at the time of his appointment three years ago by the mayor, but he gave assurances of his intent to establish residency in Newark. Within 60 days of appointment he took up Newark quarters with relatives of his wife. He lives there during the week, but on weekends commutes to Philadelphia where his family continues to live and where his children attend school. In the view of the Newark Law Department he is not a bona fide resident, but nothing has been done by the city either to compel him to modify his status or to terminate his employment.
Included among the evidence received by the court was testimony from attorneys whose terms of service either as corporation counsel or first assistant corporation counsel to *582 the city extends back to the early 1950s. It is found therefrom that at no time during this interval was counsel ever consulted in connection with the enforcement of the ordinance. Except for the Kennedy case, the Law Department has played no part in the life of the residency ordinance.
As to the 16 individual plaintiffs who testified it is concluded that enforcement of the ordinance would cause great hardship. The circumstances of their nonresidence have never been concealed from the city, and the periods of their nonresidency range from as recently as 1974 to as far back, in one case, as 1958. They are involved in the communities where they reside. Those with children have them in local public schools. Some are homeowners carrying mortgages at advantageous interest rates; some are supporting aged parents. In varying degrees the alternatives of returning to the city or facing job termination loss are profoundly burdensome.
This controversy has been principally provoked by the residency exemption enacted into law for the benefit of police and firemen effective February 15, 1972. It is contained in N.J.S.A. 40A:14-9.1 which provides as follows:
No municipality shall pass any ordinance, resolution, rule, regulation, order or directive, making residency therein a condition of employment for the purpose of original appointment, continued employment, promotion, or for any other purpose for any member of a paid fire department and force or paid member of a part-paid fire department and force, and any such ordinance, resolution, rule, regulation, order or directive in existence on the effective date of this act or passed hereafter shall be void and have no force or effect.
The statutory counterpart for policemen reads in substantially identical language, N.J.S.A. 40A:14-122.1, enacted simultaneously with § 9.1.
The effect of the foregoing is to cancel local government's power to require police and firemen to live in the city. Its impact is that 75% of Newark's nonresident employees are thereby accorded privileged status. The question projected therefrom is whether the requirement may be extended *583 to the remaining employees compatibly with the constitutional imperative that the law be "uniformly applied" within the intent and purpose of the Equal Protection Clause. The test is whether there is a rational basis for the separate classifications. Kennedy v. Newark, supra 29 N.J. at 183; Note, "Municipal Employee Residency Requirements," 84 Yale L.J. 1683, 1689 (1975). That plaintiffs happen to be municipal employees does not affect their constitutional status. They are entitled to be treated alike, absent a rational basis for discrimination.
Though the state has a broad discretion in the selection of the class, it is requisite that the classification have a reasonable and just relation either to the general object of the legislation or to some substantial consideration of public policy or convenience or the service of the general welfare. Otherwise, there would be arbitrary discrimination. [Washington National Insurance Co. v. Board of Review, 1 N.J. 545, 552 (1949)]
Although government may treat different classes of persons differently, the distinction in classification "must rest on some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike." Royster Guano Co. v. Virginia, 253 U.S. 412, 40 S.Ct. 560, 64 L.Ed. 989 (1920). Whenever a classification is shown to have a discriminatory effect on a particular class, the state must bear the burden of showing a rational basis for its classification. Dandridge v. Williams, 397 U.S. 471, 485, 90 S.Ct. 1153, 1161-62, 25 L.Ed.2d 491, 501-03 (1970); McGowan v. Maryland, 366 U.S. 420, 425-27, 81 S.Ct. 1101, 1105-08, 6 L.Ed.2d 353, 399-400 (1961).
Judged by these standards it is concluded that the City of Newark residency ordinance, from which are excluded by statute all police and firemen, approximately 25% of the city's employees, is constitutionally invalid and unenforceable. No reasonable basis has been shown for according different treatment among these members of a general class of employees which has any relationship to the policy *584 of the residency requirement. The fact that police and firemen have been held "municipal officers" within the meaning of N.J.S.A. 40:46-14 (now N.J.S.A. 40A:9-11), providing for the vacation of office upon cessation of residency, Mercadante v. Paterson, 111 N.J. Super. 35 (Ch. Div. 1970), aff'd 58 N.J. 112 (1971), does not provide the needed basis in reason for the discrimination. As the Supreme Court observed in Washington National Ins. Co. v. Board of Review, supra, as to the due process and equal protection guaranties:
Each forbids class legislation arbitrarily discriminatory against some and favoring others in like circumstances. It is essential that the classification itself be reasonable and not arbitrary, and be based upon material and substantial distinctions and differences reasonably related to the subject matter of the legislation or considerations of policy, and that there be uniformity within the class. The equal protection of the laws means that no person or class of persons shall be denied the protection of the laws enjoyed by other persons or classes of persons under similar conditions and circumstances, in their lives, liberty, and property, and in the pursuit of happiness, both as respects privileges conferred and burdens imposed. [1 N.J. at 553]
Based upon the attempted distinction as to the nature of services provided, a sound case could probably be made in support of a residency ordinance applicable only to police and firemen and not others, e.g., Detroit Police Officers' Ass'n v. City of Detroit, 385 Mich. 519, 190 N.W.2d 97 (Sup. Ct. 1971), app. dism. 405 U.S. 950, 92 S.Ct. 1173, 31 L.Ed.2d 227 (1972). But it is hardly a reasonable basis upon which to justify the classifications before us now. The need for immediately available manpower in the event of an emergency is "more realistic and meaningful" in the case of police and firemen than for stenographers, clerks, analysts, accountants, laborers, computer operators and welfare workers. Abrahams v. Civil Service Comm'n, supra, dissent, 65 N.J. at 86. Indeed, many of such ordinances elsewhere in the country are so framed. Note, "Municipal Employee Residency Requirements," 84 Yale L.J., supra, at 1688, 1696.
*585 In determining whether exempting police and firemen is in some way related to the policy interests underlying the residency requirement we must, of course, first identify those interests. In what has been described as a "laundry list," Note, "Municipal Employee Residency Requirements," supra, at 1695, fn. 60, the Supreme Court of California recently catalogued them as follows in Ector v. City of Torrance, 10 Cal.3d 129, 109 Cal. Rptr. 849, 514 P.2d 433, 436 (1973), cert. den. 415 U.S. 935, 94 S.Ct. 1451, 39 L.Ed.2d 493 (1974):
Among the governmental purposes cited in these decisions or now urged by amici curiae are the promotion of ethnic balance in the community; reduction in high unemployment rates of inner-city minority groups; improvement of relations between such groups and city employees; enhancement of the quality of employee performance by greater personal knowledge of the city's conditions and by a feeling of greater personal stake in the city's progress; diminution of absenteeism and tardiness among municipal personnel; ready availability of trained manpower in emergency situations; and the general economic benefits flowing from local expenditure of employees' salaries.
The foregoing list was considered by our Supreme Court in Abrahams v. Civil Service Comm'n, supra 65 N.J. at 72, and the items thereon noted as "pertinent," particularly "the interest of a city like Newark in promoting employment of its residents." Fully accepting that these are "rational justifications" for the residency requirement, it does not follow from this that they are any more or less applicable in the case of one employee group than the other. To the extent that any of these enumerated considerations apply to either, they apply equally to the other. Hence, there is nothing to be found in the statute's policy considerations on which to distinguish between the two groups, and since it is impossible to discern on what other basis different treatment has been accorded, the classification is arbitrary and the residency requirement must be held unequally applied. That the defect is not solely attributable to the action of the city, but rather to the statutory limitations placed upon its power *586 to legislate, does not alter the fact that the final result represents an unconstitutional exercise of power.
We acknowledge the familar presumptions favoring the validity of legislative action and the constitutionality of their enactments. Harvey v. Essex Cty. Bd. of Freeholders, 30 N.J. 381, 388 (1959); In re Freygang, 46 N.J. Super. 14, 27-28, (App. Div. 1957), aff'd 25 N.J. 357 (1957). Still, our coordinate branch of government is a human institution, and the product of its labor will, on occasion, reflect unaccountable departures from the usual high seriousness of its deliberations.
If there is any basis for believing that the rationality of these classifications was in some way a factor in the passage of the exemptions, it is certainly not to be found in testimony received from the mayor of one large city, now also a member of the Senate, who recounted his impressions of the day when the Assembly met to consider this bill for final passage. He, together with the mayors of five other large cities, came to the State House to argue against the proposed legislation. Upon arrival they found the State House and its surrounding areas virtually sealed off by a milling force of police and firemen, and the conditions they saw were such that the general public, including school children who came to observe the orderly processes of government, was barred from the building.
Before the legislative session the mayors met with the one assemblyman who was available to them, but hardly had the meeting begun when the room was broken into and overrun by supporters of the bill. They first joined the mayors and the assemblyman at their conference table and then used that appliance to push and hold the elected officials against the wall while they discoursed about the merits of the bill. Although he was unable to enter the Assembly chamber, from his vantage point the witness could later hear, through the chaos that prevailed within, that all attempts to argue against the bill were being shouted down, and the enactment was passed without any semblance of debate.
*587 Testimony disclosed that the vote had been preceded by a carefully organized and well financed legislative campaign conducted by an ad hoc association of police and firemen in which each legislator had been personally interviewed, legislative counsel had been engaged, mailings and placards prepared, buses hired, and large numbers of supporters rallied to be present at the State House on the day scheduled for final legislative action.
Nor can we ignore, in a comparable setting, the circumstances attending the 1974 amendment to N.J.S.A. 40A:9-1, poignantly headlined by the press as the "Love Bill." This enactment came about following the marriage of two public officials of separate municipalities, he a village clerk and she an appointed tax assessor. Both were subject to the statute's requirement that they each reside in the separate municipalities where they held office, and they were therefore precluded from sharing a common habitation. The testimony soberly describes how, solely in response to their unique dilemma, a bill was prepared which, with suitable sponsorship, was convoyed through the various echelons of political authority and thereafter enacted into law. In this manner there came into existence the exception for all appointed tax assessors from the residency requirement imposed upon other municipal officials throughout the State.
It is not suggested that these extrinsic matters have played any part in arriving at our judgment that the ordinance is unconstitutional. That conclusion has already been reached on a purely textual basis. What is gained from their consideration, however, is the reassurance that the constitutional principles applied are not merely exercises in abstraction; that they are pragmatically related to the realities of the American political system, and that the manifest unfairness and inequalities which these exemption statutes create did not happen from accident or oversight. Their very purpose was to create privilege and favoritism, and their existence can be understood only as the booty of well-represented special interests.
*588 Smith v. Newark, 128 N.J. Super. 417 (Law Div. 1974), aff'd 136 N.J. Super. 107 (App. Div. 1975), is not contrary to the conclusion here reached. In that case plaintiff, a resident fireman, brought the action to invalidate the firemen's exemption, N.J.S.A. 40A:14-9.1, upon the theory that the statute was special, and not general, legislation. His purpose was to eliminate from consideration for promotion a number of nonresident firemen who had taken a competitive examination. In concluding that the statute satisfied the constitutional requirement that it be general, and not special, the court explained, in effect, that it treated equally all members of the group who were "distinguished by characteristics sufficiently marked and important to make them a class by themselves." All members of the group, i.e., "firemen," were being treated equally by the statutory exemption from the residency requirement. See 128 N.J. Super. at 427. Here the circumstances are different. Although the plaintiff class and the exempted class are members of the same group, i.e., "employees," for purposes of the residency ordinance they are not being treated equally and there is no basis for differentiating the occupational divisions. The principle central to the Smith decision is (at 428) that "a law is general if it embraces all and excludes none whose conditions and wants render such legislation equally appropriate to them as a class," a standard to which the ordinance does not conform.
We have noted previously that the present administration has withheld application of the residency ordinance to the officials and the assistants thereof enumerated in N.J.S.A. 40A:9-1. This is done upon the belief that the enactment immunizes those officials to the same extent as the police and firemen exemption statutes do. Section 9-1 provides:
Residence of officers.
Except in the case of counsel, attorney, engineer, health officer, auditor, comptroller, appointed tax collector, appointed tax assessor, or members of boards of assessors or as otherwise provided by law, *589 every person holding an office, the authority and duties of which relate to a county only, or to a municipality only, shall reside within said county or municipality, as the case may be.
Any person holding or attempting to hold any such office in a county or municipality in violation hereof, may be ousted in a proceeding in lieu of prerogative writ.
But the difference between the two statutes is unmistakable. Section 9-1 mandates that, with specified exceptions, all municipal officers shall reside within their municipality. It expresses no prohibition upon the operation of a residency requirement enacted by local government. On the other hand, the exemption statutes clearly excise police and firemen from the residency ordinances, specifically prohibit the municipalities from imposing such requirements upon police and firemen, and actually nullify such ordinances then in existence or thereafter to be enacted. Where the Legislature intended to accomplish this result it evidently knew how to express itself.
While it is true that in the exercise of delegated power a municipality may not legislate in conflict with state statutes, it should be remembered that a liberal construction of legislation in favor of local authority is favored. N.J. Const. (1947), Art. IV, § VII, par. 11. As the court said in Kennedy v. Newark, supra:
Had the Legislature intended to restrain local action, the more likely course would have been to express that purpose. Before it can be said that the police power delegated to local government must remain inert, it must be clear that the Legislature intended to occupy the field or declared a policy at war with the decision made by local government. The delegated power may not be restrained upon the basis of speculation or dubious inference. [29 N.J. at 187]
See, too, Inganamort v. Fort Lee, 62 N.J. 521 (1973).
It is concluded that the Legislature intended no interference with the city's right to regulate the residence of the officers named in § 9-1.
We deal finally with plaintiff's claim that the city's refusal to enforce the ordinance against employees of autonomous *590 agencies such as the Housing and Parking Authorities, the Museum and Library, reflects a further lack of uniformity in application so as to contribute to the denial of equal protection to members of the plaintiff class.
The relationship between the city, its Housing Authority and the employees thereof has been dealt with in a line of appellate opinions. In Jersey City Housing Auth. v. Civil Service Dep't, 87 N.J. Super. 146 (App. Div. 1965), it was held that laid-off permanent employees of the City of Jersey City had reemployment rights to comparable positions in the Housing Authority superior to those of temporary employees of the Housing Authority, and that the maintenance of a common reemployment list was lawful. It has also been held that even though a Housing Authority is an entity separate and distinct from the municipality creating it, "it is an agency of the municipality creating it and is not considered autonomous for purposes of civil service administration." Civil Service Dep't v. Newark, 131 N.J. Super. 275, 278 (App. Div. 1974). It was also said in De Vita v. Paterson Housing Auth., 17 N.J. 350, 360 (1955), a case involving veterans' tenure, that a housing authority is engaged in a "municipal function" and there is nothing to suggest "that its officers and employees are to be differentiated from other persons engaged in the public service at the municipal or higher levels."
While the proposition that the 1,200 employees of the Housing Authority, embracing 319 nonresidents, are subject to the residency requirement is not as clear as the status of municipal officials under § 9-1, still, this result is sufficiently foreshadowed by the cited authorities as to be more than merely colorable and certainly meriting of an attempt to secure court determination thereof. However, the city appears to have resolved the question in favor of the Authority employees and has failed to take any enforcement measures whatever against them.
*591 Since questions of construction are presented as to the Authority employees' status which may require the development of a complete factual record, we refrain from any holding in connection therewith, particularly since such employees have not joined the action nor been given an opportunity to participate. However, the failure on the part of a city administration which professes itself to favor strongly an all encompassing residency requirement to take any action against this large group of employees must be taken as evidence of its policy of selective enforcement.
It is therefore concluded that the denial of equal protection found to result from the statutory exemption for police and firemen from the Newark Residency Ordinance is singly and collectively compounded by the pattern of selective enforcement implicit in the city's (1) studied policy of non-enforcement which has prevailed throughout the history of the ordinance; (2) its continued refusal to attempt enforcement of the requirement against employees of its municipal agencies; (3) its continued refusal to attempt enforcement against its officials and their assistants enumerated in N.J.S.A. 40A:9-1; (4) its continuing practice of hiring nonresidents, and (5) by exercising its claimed power to suspend the requirement under standards no less arbitrary than are expressed as "intelligent allowances for unusual cases" despite the invalidation by our highest court of the "special circumstances" exception for reasons of vagueness. I am unable to conclude, however, that the city's utilization of independent contractors whose employees are free of the residency requirement has served as an additional means of circumventing its own ordinance. Clearly, the city has no legal duty to insist on such requirements within their contracts, and we have insufficient information as to the feasibility of doing so or as to the nature of the services provided under these contracts.
Plaintiffs' request for injunctive relief based on considerations of estoppel will be denied. Our Supreme Court *592 has expressly rejected the notion that ordinances may be repealed by inaction or of a general estoppel to enforce a regulatory measure because of widespread failure to compel compliance. Kennedy v. Newark, supra, 29 N.J. at 191. But cf. People v. Acme Markets, Inc., 37 N.Y.2d 326, 372 N.Y.S.2d 590, 334 N.E.2d 555 (Ct. of App. 1975). Furthermore, equitable estoppel involves conduct, acts of reliance and changes in position, Feldman v. Urban Commercial, Inc., 70 N.J. Super. 463, 474 (Ch. Div. 1961), which cannot be found here as to the individual absentee members of the plaintiff class. But even as to those 16 members of the class whose testimony was heard it is preferable that the issue be first considered and findings made by the Civil Service Commission. It is unique to employer-employee relations in the public employment sector and should receive the benefit of that agency's expertise. Essex Coun. #1, N.J. Civ. Serv. Assoc. v. Gibson, 118 N.J. Super. 583, 586 (App. Div. 1972).
Counsel for plaintiff is requested to present an order for declaratory judgment in accordance with this opinion and providing for appropriate injunctive relief consented to as to form or on five days notice. R. 4:42-1(b).